# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

*Unsealed 10/7/03*
*per AUSA*
*Moreno-Taxm*

UNITED STATES OF AMERICA

V.

**CRIMINAL COMPLAINT**

MHAMMAD A. ABU-SHAWISH, (d.o.b. 06/07/1963)
a/k/a Mohammed Abu-Shawish

CASE NUMBER: 03 - M - 262

I, Dean M. Phillip, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about October 30, 2002, in Milwaukee County, in the State and Eastern District of Wisconsin, **MHAMMAD A. ABU-SHAWISH**, the defendant, did knowingly aid and abet the obtaining of a false United States visa by for an individual in Amman Jordan in order to assist the individual in entering the United States illegally in violation of Title 18, United States Code, Sections 1546 and 371 and on or about March 31, 2002, in the State and Eastern District of Wisconsin Mhammad Abu-SHAWISH at the time serving as an agent of Arabian Fest did intentionally misapply $15,436.78 then owned by and under the care, custody and control of that organization, At that time Mhammad Abu-SHAWISH paid himself $15,436.78 with the funds received from the CDBA Office, the Original Plan had already been completed and did require any work to be done by Mhammad Abu-SHAWISH in violation of Title 18, United States Code Section 666.

I further state that I am a Special Agent with the United States Department of State (hereinafter "DOS" or "Department", and this complaint is based on the following facts:

Please see the attached affidavit.

Continued on the attached sheet and made a part hereof:   X Yes    No

Signature of Complainant
Dean M. Phillip

Sworn to before me and subscribed in my presence,

_____ October 2 , 2003 _____
Date

_____ at Milwaukee, Wisconsin _____
City and State

The Honorable PATRICIA J. GORENCE.
United States Magistrate Judge
**Name & Title of Judicial Officer**

Signature of Judicial Officer

<u>AFFIDAVIT IN SUPPORT OF ARREST WARRANT</u>
<u>FOR MHAMMAD ABU-SHAWISH</u>

<u>AND FOR SEARCH WARRANTS</u>
<u>FOR</u>
<u>MHAMMAD ABU-SHAWISH'S RESIDENCE</u>
<u>4519 WEST FILMORE DRIVE, MILWAUKEE, WISCONSIN</u>

<u>& SULTAN'S FAMILY RESTAURANT</u>
<u>3800 WEST NATIONAL AVENUE, MILWAUKEE, WISCONSIN</u>

Your Affiant, Dean M. Phillip, being duly sworn, hereby deposes and says that:

1.      I am a Special Agent with the United States Department of State (hereinafter "DOS" or "Department), Diplomatic Security Service (hereinafter "DSS") and have been so employed since February 10, 2002. I am empowered to investigate violations of the laws of the United States involving the laws governing the issuance of passports, visas, and other travel documents utilized to transit international borders. I also investigate criminal acts involving malfeasance of United States Government Employees involved in the issuance of United States visas, possession or use of counterfeit or altered visas, and the unlawful solicitation of United States government employees to engage in the illegal issuance of United States visas. I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program. I have received specialized training in the investigation of visa and passport fraud. I make this affidavit based upon my own knowledge, upon electronic records furnished to me in my official capacity, and upon information and documents furnished to me in my official capacity by other federal agents, confidential sources, and witnesses. This affidavit does not contain every material fact that I have learned during the course of this investigation but rather sufficient facts to support the warrants requested.

1

2. I have been conducting a joint criminal investigation with special agents of the Federal Bureau of Investigation (hereinafter "FBI"), Bureau of Immigration and Customs Enforcement, formerly known as INS, (hereinafter "ICE"). The investigation has revealed that Mhammad Abu-SHAWISH as the Executive Director of Arabian Fest, created false "formal letters of invitation" to be submitted in support of applications for American visas in exchange for money. The investigation has also revealed that Mhammad Abu-SHAWISH has misappropriated a federally funded grant he received, as the Executive Director of Arabian Fest, in the amount of $75,000 during the years 2001 and 2002.

3. I am working with FBI Special Agent Parker Shipley as well as several agents working on this joint investigation, which primarily involved investigative activity in Illinois, Wisconsin, Washington D.C., and the Hashemite Kingdom of Jordan.

4. This affidavit is submitted in support of an arrest warrant for Mhammad Abu-SHAWISH and for search warrants for Mhammad Abu-SHAWISH 's residence located at 4519 West Filmore Drive, Milwaukee, Wisconsin and Sultan's Family Restaurant located at 3800 West National Avenue, Milwaukee, Wisconsin in order to seek evidence that will indicate that Mhammad Abu-SHAWISH and other individuals in the United States (hereinafter "U.S.") acting allegedly on behalf of Arabian Fest have been issuing materially false "formal letters of invitation" for Arabian Fest, to numerous persons who are foreign nationals in Amman Jordan for the sole purpose of aiding them in obtaining illegal visas. In addition, Mhammad Abu-SHAWISH has allegedly, acting on behalf of Arabian Fest, misappropriated federal funds.

**Locations to be Searched**

5.     Your affiant has determined that Mhammad Abu-SHAWISH's residence is located at 4519 West Filmore Drive, Milwaukee. It is a 2-story single family dwelling and is a frame house, white with green trim. The numbers 4519 are prominently displayed on the front of the house. It has a detached 2 car garage that is white with green trim. The house is located on the south side of West Filmore Drive with the front door facing north.

6.     Your affiant has determined that Sultan's Family, 3800 West National Avenue, Milwaukee, is a business located on the ground floor of a 2- story brick commercial building on the north side of West National Avenue. The business is clearly marked with large signs that say "Sultan's Family Restaurant" easily visible from both West National Avenue and 38th Street. The front door to the restaurant is on an angle located on the southeastern corner of the building between National Avenue and 38th Street.

7.     There is also probable cause to believe that evidence of violations of Title 18, United States Code, Sections 371, 666, and 1546 are contained at Mhammad Abu-SHAWISH's residence, located at 4519 West Filmore Drive, Milwaukee and at Sultan's Family Restaurant, located at 3800 West National Avenue, Milwaukee.

**Mhammad Abu-Shawish is Founder and Director of Arabian Fest**

8.     Mhammad Abu-SHAWISH, was the founder and the Executive Director and President of a non-profit corporation known as the ARABIAN FEST ARAB AMERICAN FESTIVAL INC. (hereinafter "Arabian Fest"). The Arabian Fest office was formerly located at 3741 West National Avenue, Milwaukee, Wisconsin, but has recently

3

moved to Mhammad Abu-SHAWISH's business, Sultan's Family Restaurant, located at 3800 West National Avenue, Milwaukee, Wisconsin. Mhammad Abu-SHAWISH was the Executive Director of the Arabian Fest which controlled the Arabian Festival, a relatively new Middle Eastern cultural event that had taken place each September at the Henry W. Maier Festival Park in Milwaukee, Wisconsin since 1998 except for 2001.

9.      Arabian Fest, from 1998 to the present, was a non-profit organization engaged in putting together an annual festival in the City of Milwaukee and Eastern District of Wisconsin. More specifically, during each of the calendar years 2001 and 2002, Arabian Fest was the recipient of benefits in excess of $10,000 under a Federal program involving a grant, contract, loan and/or other form of Federal assistance.

11.     In 2001 and 2002 Federal programs provided Arabian Fest with a total of $75,000. The source of such federal program funds for Arabian Fest was from the United States Department of Housing and Urban Development (HUD) through the City of Milwaukee, Community Development Block Grant Administration Office (hereinafter "CDBA Office").

12.     Your affiant has determined that in 2001 Mhammad Abu-SHAWISH, acting as President and Executive Director of Arabian Fest applied for and received a federal government grant for $75,000 through the CDBA Office. The grant was disbursed in 2001 and 2002 by the CDBA Office to Arabian Fest based on false representations made by Mhammad Abu-SHAWISH.

4

## Maintenance and Issuance of Non-Immigrant Visas

13.     Generally, a citizen of a foreign country who wishes to enter the U.S. must first obtain a visa, either a non-immigrant visa for a temporary stay or an immigrant visa for permanent residence.  Pursuant to Title 8, United States Code, Section 1201, consular officials at U.S. Embassies abroad are authorized to issue non-immigrant visas to foreign nationals who wish to visit the U.S.  Such visitors can receive a non-immigrant visa if they desire to enter the U.S. temporarily for business (a B-1 visa) or pleasure (a B-2 visa).

14.     Applicants for visitor visas must show that they qualify under provisions of the Immigration and Nationality Act.  The presumption in the law is that every visitor visa applicant is an intending immigrant.  Therefore, applicants for visitor visas must overcome this presumption by demonstrating that the purpose of their trip is to enter the U.S. for business, pleasure, or medical treatment, that they plan to remain for a specific, limited period, and that they have a residence outside the U.S. from which they have no intention of abandoning as well as other binding ties that will insure their return abroad at the end of the authorized short visit.

15.     At the U.S. Embassy in Amman Jordan, in order for an applicant to receive a non-immigrant visa to enter the U.S., the applicant is required to fill out the Visa Application Form, called a DS-156, formerly called an OF-156, which requires the applicant to list various identifying information such as name, date of birth, nationality, occupation, address and how the cost of their travels and expenses will be met.  The applicant is also asked to submit a valid passport and a passport photograph, and pay a

$100.00 non-refundable fee. In addition, the applicant is required to fill out a more extensive supplemental form called DS-157[1].

16.    A visa does not guarantee entry into the U.S. The Directorate of Border and Transportation Security (formerly INS) in the Department of Homeland Security has authority to deny admission. At the port of entry, a Directorate of Border and Transportation Security official must authorize the traveler's admission to the U.S. If admission is allowed, the Directorate of Border and Transportation Security will validate what is known as a Form I-94[2], Record of Arrival-Departure. The traveler fills out part of this form, which is subsequently stamped by an Immigration official, indicating, among other things, the length of stay permitted for the traveler.

**Federal Agents' Investigation in Amman Jordan**

17.    On August 24, 2002, federal DSS agents received information from a DSS confidential source (hereinafter "CI1") alleging ongoing visa fraud at the American Embassy in Amman Jordan. Based on subsequent information provided by CI1, a Palestinian-Jordanian has been convicted and deported for visa fraud based primarily on information provided by CI1 in 2002.

18.    In November 2002, DSS agents in Amman Jordan informed your affiant that an unidentified individual had sent a letter to the U.S. Embassy in Amman Jordan

---

[1]The DS-157 requires additional information on visa applicants and was developed in response to the September 11, 2001 terrorist attacks in New York and Washington DC.

[2]On the I-94, the traveler indicates his name, birth date, country of citizenship, sex, passport number, airline and flight number, country where he/she lives, city where the traveler boarded, city where visa was issued, date issued, and address while in the U.S. including city and state.

alleging that individuals in Jordan and the U.S. were conspiring to obtain visas for unqualified applicants by providing false "formal letters of invitation" to Arabian Fest in support of their visa application. According to the letter, which has been reviewed by your affiant, individuals applied for a visa at the embassy to attend an Arab festival in the U.S. in exchange for $10,000.

19.     On November 23, 2002, your affiant and other law enforcement agents flew to Amman Jordan to continue this investigation. While in Jordan, one of the embassy employees alerted your affiant to his concern that Arabian Fest and its Director, Mhammad Abu-SHAWISH, was involved in the illegal activity vis-à-vis U.S. visas and that Mhammad Abu-SHAWISH was working with others in order to assist foreign nationals in receiving visas predicated on material false information.

20.     Also in November, 2002, another employee, a visa clerk, (hereinafter "the visa clerk") informed your affiant that three Jordanian foreign nationals came to the U.S. Embassy in Amman Jordan on or about October 6, 2002 and informed the Foreign Service Officer on duty that day that they would be traveling to the U.S. for the purpose of attending the Arabian Fest in Milwaukee, Wisconsin. According to the visa clerk, the Foreign Service Officer on duty that day refused to issue visas to the three foreign nationals having deemed them to be unqualified applicants. The visa clerk further stated that the same three foreign nationals returned to the embassy on October 21, 2002, and were again denied a visa to the U.S. On October 30, 2002 the same three foreign nationals reappeared at the embassy with a "formal letter of invitation" from Arabian Fest signed by Mhammad Abu-SHAWISH and were granted visas.

7

21. The visa clerk stated she contacted one of the embassy's appointment secretaries who confirmed that the three foreign nationals were scheduled to have a personal audience at the embassy.

22. The visa clerk stated that the three foreign national's visas required the embassy to overturn the decision of the Foreign Service Officer on duty that day. The visa clerk was well aware of Mhammad Abu-SHAWISH and stated that Mhammad Abu-SHAWISH telephoned the embassy on numerous occasions in support of visas submitted by foreign nationals claiming to want to go to Arabian Fest in Milwaukee, Wisconsin.

23. Your affiant corroborated the visa clerk's statements by reviewing Department records on the three Jordanian foreign nationals. The review indicated that all three had been denied visas before the intervention of Mhammad Abu-SHAWISH. A review of the ledger confirmed that the three men were granted visas on October 30, 2002.

24. DSS agents assigned to the embassy, in coordination with the Jordanian Public Safety Directorate (hereinafter "PSD"), interviewed one of the three men at the U.S. Embassy in Amman, Jordan subsequent to his receipt of the U.S. visa. This Jordanian foreign national admitted he had long desired to immigrate to the U.S. in order to achieve a higher standard of living than was available to him in Jordan. This Jordanian, knowing that his true purpose for the visa would have made ineligible for a visa, decided to contact an individual commonly known to have connections to the Arabian Fest and its director, Mhammad Abu-SHAWISH, in order to obtain a false "formal letter of invitation" to the Arabian Fest in order to illegally obtain a U.S. visa. In

fact, he stated that he and the two other men that he did not know were denied visas on October 6, 2002, yet when they produced the "formal letter of invitation" on October 30, 2002, they all received visas.

25.     The same Jordanian stated that when he contacted the individual known to have connections to Arabian Fest (hereinafter the "Jordanian Middleman") the Jordanian Middleman confirmed to him that he had connections with Mhammad Abu-SHAWISH and Mhammad Abu-SHAWISH could provide him with a false "formal letter of invitation" to Arabian Fest in order to be issued a visa to the U.S  The Jordanian Middleman also informed him that Mhammad Abu-SHAWISH would provide him with a "formal letter of invitation" to attend the festival as a coffee maker, which is not the individual's profession.  The Jordanian Middleman also told him that the cost for the false "formal letter of invitation" would be $10,000.[3]

26.     This same individual told law enforcement that the Jordanian Middleman told him that Mhammad Abu-SHAWISH had made arrangements for the visa and that he should go to the embassy on October 21, 2002 to retrieve the visa.  He stated he went to the embassy to pick up the visa on October 21, 2002.  When he arrived at the embassy he encountered the same two men who also had been previously denied visas on October 6, 2002.  This same individual stated that Mhammad Abu-SHAWISH contacted him two days later and indicated there must have been a mistake and that Mhammad Abu-SHAWISH told him that he should return to the embassy on October 30, 2002 to receive his visa.  On October 30, 2002, he went back to the embassy to find the

---

[3]It is a violation of federal law to require more than $100 for an American visa.

same other two men he had previously seen at the Embassy and all three of their visas were approved.

27.    Your affiant corroborated this individual's statements by reviewing the embassy's appointment ledgers and reviewing State Department records. The review indicated that the three men were denied visas on October 6 and 21, 2002 and that all three were subsequently issued visas on October 30, 2002 to attend Arabian Fest. Your affiant also reviewed Arabian Fest's schedule for 2002 and found that the festival had already occurred in September 2002 and was not scheduled again until September 2003.

## The "formal letters of invitation"

28.    Your affiant has examined approximately a dozen such "formal letters of invitation" issued by Arabian Fest. All the letters reviewed by your affiant were computer generated on Arabian Fest letterhead and are signed by Mhammad Abu-SHAWISH, as President & Executive Director. In addition, the letters sent in 2001 all claimed to have been written "on behalf of the Board of Directors of Arabian Fest" and included a commitment on behalf of Arabian Fest to pay for the traveler's round trip ticket from Amman Jordan to the U.S., transportation within the U.S., as well as lodging and food. The "formal letters of invitation" recovered by law enforcement were all addressed in care of a single PO Box in Jordan and several of these "formal letters of invitation" were also addressed in care of members of Mhammad Abu-SHAWISH's family at the same PO Box in Jordan. The "formal letters of invitation" enabled individuals to obtain visas to the U.S. allegedly for the purpose of attending Arabian Fest, an annual Arabic cultural event sponsored by Arabian Fest. At that time,

10

Mhammad Abu-SHAWISH knew, as explained below, that foreign nationals planned to immigrate or travel to the U.S. for other purposes and or that they had been deemed ineligible for an American visa in the past. Mhammad Abu-SHAWISH, acting as President & Executive Director of Arabian Fest, signed numerous materially false "formal letters of invitation" knowing that the individuals would not be participants in Arabian Fest and/or falsely claiming in the letters that Arabian Fest was paying for round trip tickets for the foreign nationals from Jordan to the U.S. Mhammad Abu-SHAWISH knew that at the letters would be used for purpose of obtaining visas to the U.S.

29.    On December 5, 2002, DSS identified 23 additional Jordanians who had obtained visas from the American Embassy in Amman Jordan under the claim that they planned on attending Arabian Fest in Milwaukee, Wisconsin. From 2000 to 2002 immigration checks revealed that of the 23 claimed Arabian Fest participants that are known to have entered the U.S., 12 have not departed the U.S. in accordance with the terms of their initial entry as stipulated by DHS. Of the 12 people who overstayed their visas, five are in the Milwaukee area and the final seven cannot be located and their intentions are unknown.

30.    DSS agents established that at the American Embassy in Amman Jordan, one of the 12 who has not departed the U.S. to date, had been issued an "I" visa, a non-immigrant visa reserved for bona fide representatives of foreign media as prescribed by section 101(a)(15)(I) of the Immigration and Nationality Act of 1952, as amended. DSS agents in the U.S. and Amman have established that this individual was not a legitimate reporter, as claimed on the DS-156 form.

31.     This individual admitted to having obtained the letter through Mhammad Abu-SHAWISH, for $3,000 and that payment would be expected upon entry into the U.S. and that Mhammad Abu-SHAWISH was to be paid in order for him to send the false "formal letter of invitation."

**Mhammad Abu-SHAWISH Statements Regarding Payment**

32.     In June and July 2003, your affiant, other DSS agents, and agents of the FBI sent a confidential informant (hereinafter "CI2"), under the direct supervision of law enforcement, to meet with Mhammad Abu-SHAWISH under the guise of wanting to bring foreign nationals into the U.S.  Mhammad Abu-SHAWISH admitted that he normally charged $1,000 USD for the letters and had contacts at U.S. diplomatic missions throughout the Middle East.

33.     Your affiant is aware of a DSS confidential informant (hereinafter "CI3") who obtained a false "formal letter of invitation" from Mhammad Abu-SHAWISH on behalf of Arabian Fest and signed by Mhammad Abu-SHAWISH in order to get a fraudulent visa for the U.S. in 2002.  CI3 further stated that CI3 spoke directly with Mhammad Abu-SHAWISH and Mhammad Abu-SHAWISH told him that he made $1,000 on each false "formal letter of invitation" and Mhammad Abu-SHAWISH asked CI3 to recruit additional individuals who wanted to enter the U.S. illegally.

34.     Your affiant has examined the fraudulent "formal letters of invitation" obtained in this investigation and has determined that they were computer generated and therefore your affiant seeks to copy the hard drive of any and all computers located at the places to be searched for electronic copies of the records sought.

35. Your affiant is aware that on September 23, 2003, an Economic Development Director for a South Side Community Support Organization who is very familiar with small businesses on West National Avenue, advised that Mhammad Abu-SHAWISH recently moved out of the Arabian Fest office at 3741 West National Avenue and moved all of the files and office equipment including the computers into Sultan's Family Restaurant, 3800 West National Avenue. Your affiant has been advised by the FBI agent that he has had several dealings in the past with the Economic Development Director and that he has found him to be truthful and reliable and therefore believes him to be reliable.

36. Your affiant is aware that on September 23, 2003, a Special Agent with the FBI went to the Arabian Fest Offices at 3741 West National and observed that the offices were no longer occupied by Arabian Fest which corroborated the above-described Economic Development Director's statement. A business tenant of the office building and who is believed to be a reliable witness as he is a citizen with no known reason to lie and appears credible, advised the FBI agent that Arabian Fest had moved out and referred the agent to Sultan's Family Restaurant across the street for more information regarding Arabian Fest operations.

## Federal Records Confirm Mhammad Abu-SHAWISH's Role

37. Your affiant has reviewed federally maintained records of visa applications associated with Mhammad Abu-SHAWISH and has determined that Mhammad Abu-SHAWISH issued "formal letters of invitation" for the Arabian Fest to four of his brothers as well as several other Jordanian nationals, Sarhan Abdel Aziz ABU SHAWISH, Yasser Abdel Aziz ABU SHAWISH, Abdel Wahab Abdel Aziz ABU SHAWISH, Bassam

13

Abdel Aziz Abdel Aziz ABU SHAWISH, in 2000. None of these "formal letters of invitation" revealed Mhammad Abu-SHAWISH"s familia relationship to his brothers. In addition, Mhammad Abu-SHAWISH issued a "formal letter of invitation" to a person he claims to be his ex-wife and the mother of his four children, Wafieh Mohammad ABU JUBRAN. That "formal letter of invitation" was dated August 27, 2001. Your affiant knows that Arabian Fest was cancelled just after the September 11th terrorist attacks on the World Trade Center in New York. Records maintained by the federal government regarding entries into the U.S. indicated that Wafieh Mohammad ABU JUBRAN left Jordan several days after Arabian Fest had been scheduled to occur. (Arabian Fest was scheduled to occur on September 14 - September 16, 2001).

38. His brothers and mother of his children all subsequently utilized the "formal letters of invitation" signed by Mhammad Abu-SHAWISH to obtain U.S. visas at the American Embassy in Amman Jordan between 2000 and 2001.

39. Your affiant has also determined that the immigration records of several of Mhammad Abu-SHAWISH's relatives indicate that they were refused visas in the past and/or did not have a specific job at Arabian Fest.

40. Your affiant has further determined, that Sarhan Abu-SHAWISH had been denied a visa on August 31, 2000, yet four months later, on December 17, 2000, the embassy issued a visa to Sarhan Abu-SHAWISH for the stated purpose of attending the Arabian Fest in Milwaukee, Wisconsin. Your affiant also noted that the visa had been issued three months after the Arabian Fest was scheduled to have taken place in 2000 (Arabian Fest was scheduled to occur on September 15 - September 17, 2000).

14

41.     Your affiant further states that he has been informed by the FBI that on August 14, 2003, the FBI was at Mhammad Abu-SHAWISH's residence located at 4519 West Filmore Drive and that the FBI observed a light blue hard sided train case containing numerous documents, checks, other financial documents and immigration documents pertaining to Arabian Fest and Sultan's Family Restaurant. This case was opened in front of the FBI by one of the residents at that address. The FBI also observed that the case contained at least one passport and pieces of paper which included flight information, email addresses, checks, and international telephone numbers.

## The 2001 Budget as Evidence of the Material Falsehood Contained in the "letters of invitation".

42.     Your affiant has reviewed the Arabian Fest website which stated that on August 25, September 1, and September 7, 2002, Sunday planning meetings for Arabian Fest 2002 were held at Sultan's Family Restaurant at the invitation of the Arabian Fest Board of Directors. The meetings were open to the public. Mhammad Abu-SHAWISH founded and is the registered agent for the Sultan's Family Restaurant, Milwaukee, Wisconsin.

43.     Your affiant has traveled to Jordan on official business in 2002 and knows that a standard round trip ticket can cost over $6,000. Therefore, your affiant believes that the submitted budget clearly supports the fact that Mhammad Abu-SHAWISH sent the "formal letters of invitation" knowing that the commitment to pay for the round trip travel was materially false.

44.     Your affiant has also reviewed a 2001 budget for Arabian Fest which was submitted by Mhammad Abu-SHAWISH as part of a grant request for $100,000 from the CDBA Office, which is federally funded by HUD. The budget submitted by Mhammad Abu-SHAWISH indicated that the operating budget for Arabian Fest was approximately $85,000 and that the gross income for Arabian Fest was also about $85,000. Of significance is the fact that the 2001 budget submitted to the CDBA Office stated that *only $300* was budgeted for travel for the entire festival. No other line items appear to provide for the round trip travel and expenses of the ten foreign nationals who received "formal letters of invitation" for the 2001 festival as was asserted in the "formal letters of invitation" by Mhammad Abu-SHAWISH.

45.     Also of significance is the fact that several of the ten (10) foreign nationals who had received "formal letters of invitation" for 2001 left Jordan and came to the U.S. days after Arabian Fest had been cancelled.

## Mhammad Abu-SHAWISH's Request for Federal Grant Money

46.     Your affiant has also reviewed the letter dated April 11, 2001, submitted by Mhammad Abu-SHAWISH to the CDBA Office on behalf of Arabian Fest. Mhammad Abu-SHAWISH requested a grant for $100,000 of CDBG money to hire three positions to carry out the below listed plan:

"Recruit new businesses to open a long Muskego Ave.
Relocate other business a long that Area.
Facilitate and maintain the relationship between businesses and neighborhood. Work with businesses and residents to create a beautiful and safe neighborhood." [sic]

47.     Your affiant has reviewed the June 20, 2001 letter from the CDBA Office
to Mhammad Abu-SHAWISH informing him that on June 19, 2001 his organization was
approved to received $75,000 for the following activity:

"Planning. Develop a business plan to recruit new businesses along
Muskego Avenue."

48.     Mhammad Abu-SHAWISH identified himself and two others as the
employees who would be working on this project.  According to the documents
submitted by Mhammad Abu-SHAWISH, he was paid over $40,000 for work he claimed
to have done as part of this grant, one of the employees he claimed to have paid
approximately $15,000, and a third employee he claimed to have paid approximately
$5,000 for their work on the Muskego Avenue development plan.

49.     Mhammad Abu-SHAWISH also submitted documentation that he and
Arabian Fest had not been able to complete the project and requested that the money
be continued into 2002.  This request was granted based on his representations and he
continued to receive CDBA money in 2002.

50.     On or about May 16, 2002 Mhammad Abu-SHAWISH submitted a study
entitled "Muskego Avenue Re-development Plan" which he asserted was "prepared by
Arabian Fest"  and "Funded by Community Block Grant Administration" as proof of his
appropriate use of the $75,000 he had been granted.

51.     Your affiant has reviewed the plan submitted by Mhammad Abu-
SHAWISH and has compared it with a plan that was completed and submitted in
December 2001 by a different individual (herein after refereed to as the "Original Plan").
The author of the Original Plan is not related to Arabian Fest in any way.

52.     The plan submitted by Mhammad Abu-SHAWISH is a verbatim copy of
the Original Plan, save that it excludes some pages, uses a different font, the  words
Arabian Fest have been inserted throughout the document instead of another
organization's name, a different cover letter, cover, and an acknowledgment page had
been inserted.  For example, the following paragraph found on page three of the plan
submitted by Mhammad Abu-SHAWISH is identical to the paragraph also on page three
of the Original Plan.  The duplication even includes bold face type:

**Mhammad Abu-SHAWISH plan - page 3**

Data indicates that the primary trade area generates $61 million in retail volume in the
food store category alone. Annual household income for residents living in the Muskego
Avenue trade area is approximately $31,438.  Household expenditure in the retail category
average in excess of $12,000, while the total trade area potential exceeds
**$307 million.  The trade area is one of the richest and most diverse areas in the
City of Milwaukee.**

**Original Plan - page 3**

Data indicates that the primary trade area generates $61 million in retail volume in the food store
category alone. Annual household income for residents living in the Muskego Avenue trade area is
approximately $31,438. Household expenditure in the retail category average in excess of $12,000,
while the total trade area potential exceeds **$307 million.  The trade area is one of the richest and
most diverse areas in the City of Milwaukee.**

Another example can be found in the following sentence in the plan submitted by
Mhammad Abu-SHAWISH which is identical to the sentence in the Original Plan.  The
duplication even includes a typographical error found in the Original Plan in that the
closed quotation mark was left out after the word Plan:

**Mhammad Abu-SHAWISH plan - page 2**
The Muskego Avenue Redevelopment Plan (hereinafter "the Plan) was written for
implementation....

**Original Plan - page 2**

The Muskego Avenue Redevelopment Plan (hereinafter "the Plan) was written for
implementation....

18

53.    The author of the Original Plan told law enforcement that he was paid between $25,000 and $26,000 for the plan by another grant unrelated to the CDBA grant and that none of that money came from Mhammad Abu-SHAWISH or Arabian Fest.

54.    Mhammad Abu-SHAWISH submitted this above described copy of the Original Plan on May 16, 2002 to the CDBA Office, representing it to be the product of Arabian Fest and their employees.

55.    Your affiant has reviewed the schedule of paid costs prepared by Mhammad Abu-SHAWISH for reimbursement for his salary and has found that among several other payments, on or about March 31, 2002, in the State and Eastern District of Wisconsin Mhammad Abu-SHAWISH, at the time serving as an agent of Arabian Fest, did intentionally misapply $15,436.78 then owned by and under the care, custody and control of Arabian Fest as part of the grant. At that time Mhammad Abu-SHAWISH paid himself $15,436.78 with the funds received from the CDBA Office, the Original Plan had already been completed and did not require any work to be done by Mhammad Abu-SHAWISH.

56.    Based upon the aforementioned facts, your affiant submits that there is probable cause to believe that evidence of visa fraud and or federal grant fraud will be located at the above described addresses.

57.    Your affiant seeks to seize documents and records in this case including but not limited to items detailed in Attachment A.

58.    Your affiant further seeks to search for items described in Attachment A that may be located on any computers at the locations searched. The FBI's technical

team will be present at the time of the search warrant and will copy and or image the contents of the hard drive of any computers found at the locations searched. The computers will not be seized. The copied or imaged hard drives will be searched using the same method that would be used for searching records stored in non-electronic format (e.g., paper records stored in filing cabinets). For records stored in electronic format, this would entail opening each file, visually inspecting its content, and determining whether the file contains any of the items covered by Attachment A. Records covered by Attachment A would then be separated from those falling outside of the scope of Attachment A by either copying relevant files to another location or printing out "hard" copies. Any files copied that fall outside of the scope of Attachment A will be returned.