# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                      Case No. 03-CR-211

MHAMMAD A. ABU-SHAWISH,

    Defendant.

---

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR CERTIFICATE OF INNOCENCE

---

Mhammad A. Abu-Shawish's case has a long and storied history. In 2005, he was convicted of federal program fraud related to a $75,000.00 grant that his non-profit organization, Arabian Fest, received for a redevelopment project with the City of Milwaukee. He was sentenced to three years in prison and served the full sentence before the Seventh Circuit vacated his conviction because he was charged under the wrong statute. The government then re-indicted Abu-Shawish under the correct statute (mail fraud), but this time he was acquitted. Abu-Shawish now seeks a certificate of innocence pursuant to 28 U.S.C. § 2513(b) so that he may seek damages from the Court of Federal Claims for unjust conviction and imprisonment. The Honorable J.P. Stadtmueller presided over the trial in which Abu-Shawish was convicted and has referred this matter to me for a report and recommendation as to whether the certificate of innocence should be granted.

## APPLICABLE LAW

Two statutes—28 U.S.C. § 1495 and 28 U.S.C. § 2513—provide those who have been unjustly convicted and imprisoned for a federal crime a damages remedy against the

United States. *Abu-Shawish v. United States*, 898 F.3d 726, 733 (7th Cir. 2018). Section 1495 gives the Court of Federal Claims jurisdiction over "any claim for damages by any person unjustly convicted of an offense against the United States and imprisoned." 28 U.S.C. § 1495. However, in order to pursue a claim for damages, the unjustly convicted must obtain a certificate of innocence from the court of conviction. To obtain a certificate of innocence under § 2513, a petitioner must prove: (1) that the court that reversed or set aside his conviction did so on the ground that he is not guilty of the offense for which he was convicted; (2) that he did not commit any of the acts charged, or that those acts or related acts constituted no crime against the United States or any state; and (3) that he did not, by misconduct or neglect, cause or bring about his own prosecution. *Abu-Shawish*, 898 F.3d at 733. Although a petition for a certificate of innocence is often filed in a closed criminal case, such petitions are "civil in nature" and the petitioner bears the burden to prove by a preponderance of the evidence that he is actually innocent. *Id.* at 736, 739. Once a petitioner establishes innocence in the court of conviction and obtains a certificate of innocence, he presents that certificate to the Court of Federal Claims, which then decides damages. *Id.* at 735–36.

Because § 1495 waives the government's sovereign immunity, § 2513 is strictly construed. *Id.* at 733. Thus, a petition for a certificate of innocence is seldom filed and even more rarely granted. *Id.* at 732–33. The Seventh Circuit explained that the "few opinions on this subject highlight the result of that strict construction: out of twelve published appellate opinions with material treatment of § 2513, our opinion in *Betts* [*v. United States*, 10 F.3d 1278 (7th Cir. 1993)] is the only one to reverse and remand with instructions to grant the petition." *Id.* The court made clear that an acquittal, in and of itself, is insufficient to obtain

a certificate of innocence. *Id.* at 736–37. The petitioner must show actual innocence, and the "statute's distinction between acquittal and innocence [sets] a high bar for petitioners." *Id.* at 735.

## PROCEDURAL HISTORY

On October 7, 2003, a grand jury in this district returned a three-count indictment against Mhammad Abu-Shawish in Case No. 03-CR-211 (E.D. Wis.). Relevant here, Abu-Shawish was charged in Count Three with federal program fraud in violation of 18 U.S.C. § 666 and 2. (Docket # 6 at 6–7 in Case No. 03-CR-211.) The indictment alleged that Arabian Fest was a non-profit organization located in Milwaukee of which Abu-Shawish was the executive director. (*Id.* at ¶¶ 1–2.) The indictment alleged that between June 1, 2001 and May 30, 2002, Arabian Fest applied for and received $75,000.00 in federal grant funds to develop a business plan to recruit new businesses along Muskego Avenue in Milwaukee. (*Id.* at ¶¶ 15–17.) The indictment further alleged that the grant process required Arabian Fest to submit a completed business plan to the City of Milwaukee, but the plan Abu-Shawish submitted was not formulated by Arabian Fest. (*Id.* at ¶ 18.) Rather, the plan was taken from a December 2001 plan by an individual unrelated to Arabian Fest, for which the City of Milwaukee had already paid $25,000.00. (*Id.*)

Several superseding indictments were subsequently filed, with two Fourth Superseding Indictments (Indictment A and Indictment B), being returned on November 18, 2004. (Docket # 197 and Docket # 198 in Case No. 03-CR-211.) Specifically, the Fourth Superseding Indictment-A charged Abu-Shawish with two counts of federal program fraud. (Docket # 197 in Case No. 03-CR-211.) After a three–day trial held in June 2005, a jury convicted Abu-Shawish of one count of federal program fraud. (Docket # 246 in Case No.

03-CR-211.) Judge Stadtmueller sentenced Abu-Shawish on January 31, 2006 to thirty-six months of incarceration, $75,000.00 in restitution, and $1,100.00 in fines and assessments. (Docket # 280 in Case No. 03-CR-211.) Abu-Shawish appealed his conviction and in a decision dated November 1, 2007, the Seventh Circuit reversed his conviction. *United States v. Abu-Shawish*, 507 F.3d 550, 552 (7th Cir. 2007). The Seventh Circuit found that to be guilty under the federal program fraud statute under which Abu-Shawish was convicted, 18 U.S.C. § 666(a)(1)(A), one must be an agent of the organization defrauded. *Id.* at 553–55. The court found that "[w]ithout question, the indictment properly alleged and the evidence was sufficient to show that Abu-Shawish defrauded the City of Milwaukee. However, he was not an agent of the City of Milwaukee, and so he was not properly charged under 18 U.S.C. § 666(a)(1)(A)." *Id.* at 558. The Seventh Circuit suggested that perhaps the appropriate charge for Abu-Shawish's alleged actions was mail fraud and/or wire fraud. *Id.*

The government heeded the Seventh Circuit's suggestion, and on November 14, 2007, the grand jury returned a three-count indictment against Abu-Shawish alleging mail fraud in violation of 18 U.S.C. § 1341 and 2 and with transporting fraudulent funds in foreign commerce in violation of 18 U.S.C. § 2314 and 2. (Docket # 1 in Case No. 07-CR-289 (E.D.Wis.).) A superseding indictment was returned on January 8, 2008 (Docket # 9 in Case No. 07-CR-289) and a three-day jury trial before the Honorable Rudolph Randa was held in October 2008 (Docket # 36 in Case No. 07-CR-289). Abu-Shawish was acquitted of all three counts in the superseding indictment. (Docket # 42 and Docket # 43 in Case No. 07-CR-289.)

In 2014, Abu-Shawish filed a complaint against the United States in the Court of Federal Claims pursuant to 28 U.S.C. § 1495 and § 2513 seeking damages for unjust

conviction and imprisonment. *Abu-Shawish*, 898 F.3d at 732 (citing *Abu-Shawish v. United States*, 120 Fed. Cl. 812, 812 (2015)). Abu-Shawish had previously, and unsuccessfully, sued the government and certain individual defendants for malicious prosecution and other torts. *Id.* (citing *Abu-Shawish v. United States*, 546 F. App'x 576 (7th Cir. 2013)). The Court of Federal Claims dismissed Abu-Shawish's complaint without prejudice for lack of jurisdiction because he had not yet obtained a certificate of innocence from the court of conviction. *Id.* Abu-Shawish returned to the district court and filed a *pro se* petition for a certificate of innocence. *Id.* The district court dismissed the petition in January 2017 without a hearing. *Id.* Abu-Shawish appealed, and the Seventh Circuit vacated the dismissal and remanded with instructions to allow Abu-Shawish an opportunity to be heard and for the district court to determine whether Abu-Shawish had the requisite intent—either for federal mail or wire fraud or for a similar state crime. *Id.* at 739–40. The court ordered that when the district court "decides the case on the merits, it will need to explain its ultimate decision with reviewable findings of fact under Rule 52 and will need to make the independent determination *Betts* requires." *Id.* at 740.

Upon remand, Judge Stadtmueller referred the matter to me to conduct an evidentiary hearing and to issue a report and recommendation regarding Abu-Shawish's petition. (Docket # 335.) I held an evidentiary hearing on July 30, 2019 in which Abu-Shawish, the sole witness, testified. (Docket # 338.) Although the parties previously submitted briefs in this matter (Docket # 330, Docket # 332, and Docket # 333), the parties requested the opportunity to file post-hearing briefs and have done so (Docket # 340, Docket # 341, and Docket # 342).

# RULE 52 FINDINGS OF FACT

Although § 2513 is silent as to what procedure a court should follow in determining whether a petitioner is entitled to a certificate of innocence, courts have held that the trial court should rely on the record of the petitioner's trial and any other relevant facts presented orally or by affidavit. *See United States v. Grubbs*, 773 F.3d 726, 732 (6th Cir. 2014); *see also Abu-Shawish*, 898 F.3d at 739. In this case, I have considered the trial records in both *United States v. Abu-Shawish*, No. 03-CR-211 (E.D. Wis.) and *United States v. Abu-Shawish*, No. 07-CR-289 (E.D. Wis.), as well as the evidence submitted in direct relation to Abu-Shawish's petition for a certificate of innocence. Pursuant to Fed. R. Civ. P. 52(a)(1), I make the following findings of fact based on the evidence presented in the record.

Mhammad Abu-Shawish grew up in Jordan and immigrated to the United States in 1995. (Transcript of July 30, 2019 Evidentiary Hearing ("Evid. Hearing Tr.") at 11–12, Docket # 339.) Abu-Shawish testified that he was the founder, president, and executive director of Arabian Fest from 1997 until 2002. (June 28, 2005 A.M. Transcript of Jury Trial in 03-CR-211 ("June 28 A.M. Tr.") at 152, Docket # 292.) Arabian Fest was a non-profit organization that put on an annual cultural event that took place on the Summerfest grounds in Milwaukee. (Evid. Hearing Tr. at 12–13.) Arabian Fest's purpose was to represent and celebrate Arabic culture and help change negative stereotypes of Arab people. (*Id.* at 12.)

Abu-Shawish received a letter from Milwaukee Mayor John Norquist in 1999 stating that he appreciated the economic impact of the Arab-American community in Milwaukee and thanking Abu-Shawish for his willingness to be a liaison to the Arabic community. (June 28 A.M. Tr. at 154.) Abu-Shawish was successful in drawing members of the Arab

6

community from Illinois to Wisconsin to attend Arabian Fest; thus, building on this success, Abu-Shawish had an idea in early 2001 to create an Arabic business community on Muskego Avenue in Milwaukee, akin to Chinatown in New York or Kedzie Street in Chicago. (June 28 A.M. Tr. at 155–56; Evid. Hearing Tr. at 14.) Abu-Shawish believed Muskego Avenue was a very busy, but under-utilized street. (June 28 A.M. Tr. at 155–56.) Abu-Shawish decided to approach the district's alderman—the newly elected Bob Donovon. (*Id.* at 156.) Alderman Donovon was enthusiastic about the idea of redeveloping Muskego Avenue and suggested that Abu-Shawish speak to the Community Development Block Grant ("CDBG") division in the City of Milwaukee about obtaining funding. (*Id.* at 156–57.)

Alderman Donovon was the founder of a non-profit organization called Milwaukee Alliance. (*Id.* at 124.) Milwaukee Alliance's purpose was to unite different community groups to attack problems together. (*Id.*) In March 2001, Angela Sanfilippo, an employee of Milwaukee Alliance, contacted a developer named Randy Roth (who was also her former teacher at the University of Wisconsin–Milwaukee) regarding retaining his company—Endeavour—to create a blueprint on how to revitalize the Muskego Avenue corridor. (Oct. 15, 2008 Transcript of Jury Trial in 07-CR-289 ("Oct. 15 Tr.") at 209–12, Docket # 45; June 27, 2005 P.M. Transcript of Jury Trial in 03-CR-211 ("June 27 P.M. Tr.") at 26, Docket # 274).) Roth met with Angela and Alderman Donovon shortly thereafter to discuss the details. (Oct. 15 Tr. at 212–13.) Roth agreed to be paid $25,000.00 for his work and while he generally required clients to pay half the money for a project up front and the remainder after the project was complete, Milwaukee Alliance communicated that it did not have the $12,500.00 to pay him up front. (*Id.* at 247.) Roth and Milwaukee Alliance ultimately signed

a contract in either July or August 2001 (*id.* at 212–13, 238; June 27 P.M. Tr. at 25–26); however, Roth began work on the Milwaukee Alliance project prior to signing the contract (Oct. 15 Tr. at 238).

Roth testified that he was introduced to Abu-Shawish in the context of meeting with Milwaukee Alliance to plan for its Muskego Avenue corridor project. (June 27 P.M. Tr. at 34–35.) Alderman Donovon and Milwaukee Alliance identified Abu-Shawish as an "important player" to talk to and told Roth that they were assisting Abu-Shawish in obtaining block grant funds. (*Id.* at 35–36.) Alderman Donovon recommended that Roth create an Arab-American commercial specialized theme district in his plan. (Oct. 15 Tr. at 217.) Roth did not give any feedback at this first meeting, but he later told Alderman Donovon and Angela that given the primarily Hispanic population in the area, he believed that an Arab-American district was a bad idea. (*Id.*)

Meanwhile, Abu-Shawish spoke to Juanita Hawkins (June 28 A.M. Tr. at 157), who was the Director of the CDBG program (June 27, 2005 A.M. Transcript of Jury Trial in 03-CR-211 ("June 27 A.M. Tr.") at 3, Docket # 291). Abu-Shawish arranged an in-person meeting, where Hawkins told him that he would need to write a letter requesting funding and stating the goals he wanted to accomplish. (June 28 A.M. Tr. at 157.) In a letter dated April 11, 2001, Abu-Shawish wrote the following to Hawkins:

8

This letter is to request funding for our Business Development plan. We will be working with Alderman Bob Donovan and the cooperation of Department of City Development and other local Community Organizations to put a plan together, this plan will include:

- Recruit new businesses to open a long Muskego Ave.
- Relocate other business a long that Area.
- Facilitate and maintain the relationship between businesses and neighborhood.
- Work with businesses and residents to create a beautiful and safe neighborhood.

We are requesting the a mount of $100,000 in order to hire three positions to carry out this plan, the Block Grant Funds will be used to pay for these positions. These positions are Neighborhood Development Coordinator, Executive Director and Office Manager. With your support we will build a better environment for our communities.

Thanks for your consideration, looking forward to working with you.

(Evid. Hearing Tr. at 17, Ex. 1.) Abu-Shawish received a phone call from CDBG stating that the Common Council would meet and discuss his request. (June 28 A.M. Tr. at 159.) The meeting was held on June 19, 2001 and both Abu-Shawish and Alderman Donovon attended. (*Id.* at 159–60.) Alderman Donovon spoke at the meeting in support of Abu-Shawish's proposal (*id.* at 160), despite the fact that alderman did not often lobby in favor of grants (Hawkins' Testimony, June 27 A.M. Tr. at 10). In fact, Milwaukee's City Comptroller during the relevant time, Nicholas Loth, testified that it was very rare for an alderman to advocate on behalf of a grant. (Oct. 14, 2008 Transcript of Jury Trial in 07-CR-289 ("Oct. 14 Tr.") at 128–29, Docket # 44.) Abu-Shawish received a letter dated June 20, 2001 informing him that the Common Council approved reprogramming funds in the amount of $75,000.00 for "the following activity: Planning. Develop a business plan to recruit new businesses along Muskego Avenue." (June 28 A.M. Tr. at 160; Evid. Hearing Tr. at 19, Ex. 2.) The project was estimated to be complete by the end of 2001. (June 27 A.M. Tr. at 17.)

During this same time, Roth was becoming concerned that he was not going to get paid and began calling Angela on a biweekly basis regarding the status of the project's funding. (Oct. 15 Tr. at 246.) Angela assured Roth that the money was coming. (*Id.* at 247–

48.) While Roth testified in the first trial that Milwaukee Alliance received the funds with which they paid him from a block grant to Potowatomi Casino (June 27 P.M. Tr. at 38), Roth testified in the second trial that because he ultimately started getting paid, he never confirmed or questioned the source of the funding (Oct. 15 Tr. at 247–48). In August 2001, the Milwaukee Common Council approved a $200,000.00 block grant to Milwaukee Alliance. (Oct. 14 Tr. at 98.)

Alderman Donovon referred two of his employees—Angela Sanfilippo and her cousin, Lisa Sanfilippo[1]—to work with Abu-Shawish on Arabian Fest's Muskego Avenue project. (Evid. Hearing Tr. at 20.) In his contract with the City, Abu-Shawish was approved as executive director with a salary of $43,300.00, Angela as assistant developer with a salary of $15,000.00, and Lisa as office assistant, with a salary of $5,000.00. (*Id.*; *see also* Case No. 03-CR-211, Trial Ex. 9.)

Between June and December 2001, Abu-Shawish attended several meetings regarding performance of the Muskego Avenue project with Angela, Roth, and Alderman Donovon. (June 28 A.M. Tr. at 129.) Angela, Lisa, Roth, Alderman Donovon, and Abu-Shawish all performed work on the project before the end of the year. Roth testified that there were discussions about Arab-American business recruitment and he gave suggestions to Alderman Donovon and Abu-Shawish on the approach to use. (Oct. 15 Tr. at 218.) Roth testified that when he provided Alderman Donovon and Abu-Shawish with updates on the planning, it was more of a "one-way" street; whereas when the meetings turned to recruiting businesses, it was more of a conversation. (June 27 P.M. Tr. at 51–52.)

---

[1] To avoid confusion, Angela Sanfilippo and Lisa Sanfilippo will be referred to by their first names.

Abu-Shawish began work on the project immediately. (June 28 A.M. Tr. at 164.) It was his intention to create an Arabic District on Muskego Avenue between Mitchell Street and Burnham Street. (June 28 A.M. Tr. at 166.) His work on this project consisted of supervising Angela, Lisa, and the volunteers (*id.* at 167); joining the Crime Reduction Initiative along with Alderman Donovon, which consisted of attending monthly meetings at the police station and conducting crime reduction walks through the neighborhood (*id.* at 168–69); meeting with businesses and people in the neighborhood and instructing Angela and Lisa to start a database with the businesses' information (*id.* at 170–71); and performing some pedestrian and vehicle counts in the area (*id.* at 171).

Angela's work on the project consisted of identifying buildings on Muskego Avenue and looking at what needed to be done to the buildings to consider places to bring in Arab businesses. (June 28 A.M. Tr. at 127.) She also conducted litter pick-ups to beautify the neighborhood and inventoried buildings on Muskego Avenue. (Oct. 15 Tr. at 350.) Angela also conducted pedestrian and traffic counts and attended meetings on the project. (*Id.* at 351.) Lisa testified that her work in connection with the project was to survey the neighborhood, try to find out what kind of businesses to bring in the area, and tracking the pedestrian and vehicle traffic. (June 27 P.M. Tr. at 68.) Angela testified that the Muskego Avenue project was mainly directed by Alderman Donovon (June 28 A.M. Tr. at 143) and Lisa testified that she took direction from Angela (June 27 P.M. Tr. at 69).

Roth's work with the Milwaukee Alliance culminated in a 35-page written report dated December 2001 entitled the "Muskego Avenue Redevelopment Plan." (Evid. Hearing, Ex. 4.) Roth acknowledged that certain information found in his report was based on field survey work done by people at the Milwaukee Alliance, such as pedestrian and

traffic counts, taking photographs of buildings, quantifying the types of businesses located within the planning area, and noting the conditions of the buildings. (Oct. 15 Tr. at 223; Evid. Hearing Ex. 4.) Page 17 of Roth's plan contains a section entitled "International Theme Development" that Roth testified came about as an "off-shoot" of his meetings with Abu-Shawish. (Oct. 15 Tr. at 225; Evid. Hearing, Ex. 4 at 17.) Roth describes this section as a "concession" to Alderman Donovon and Angela, rather than telling his clients that their idea of an Arabian themed district was simply bad. (Oct. 15 Tr. at 225.) In this section on page 17, it states that "[r]epresentatives have approached Milwaukee Alliance from several different ethnic business groups to develop an International business district along Muskego Avenue between Mitchell Street and Burnham Street." (Evid. Hearing, Ex. 4 at 17.) Roth testified that the reference on page 17 to "representatives" who have approached Milwaukee Alliance from several different ethnic business groups came from information provided to him by Alderman Donovon and Angela and included the Arab-American District, as well as possibly a Hispanic commercial district or a Hmong district. (June 27 P.M. Tr. at 58–59.) Page 29 of Roth's plan contains a more detailed description of the International Business District. (Evid. Hearing, Ex. 4 at 29.) The plan states on page 29 that "[c]urrently, the City of Milwaukee has provided community block grant funds to analyze whether a specialize [sic] ethnic district would work within the corridor." (*Id.*) Roth testified that this sentence did not refer to the Arabian Fest block grant. (June 27 P.M. Tr. at 56.)

Angela received Roth's written report regarding the Muskego Avenue project late in the last quarter of 2001. (June 28 A.M. Tr. at 130–31.) Angela testified that when Alderman Donovon received Roth's report, he liked some parts and did not like other parts. (Oct. 15 Tr. at 355.) Alderman Donovon thought that Roth's plan was very "Milwaukee Alliance

top heavy" and he "wanted to be able to bring other entities into this plan. It wasn't just a Milwaukee Alliance plan. It was a community plan." (June 28 A.M. Tr. at 137.) Alderman Donovon instructed Angela to "take out a lot of the Milwaukee Alliance verbiage and make it non-specific to one group." (Oct. 15 Tr. at 355.) Angela made those changes on a computer; she took out most of the references to Milwaukee Alliance and made it more general so that any group could use Roth's plan. (*Id.* at 355–56.)

Lisa proofread Roth's report at the direction of Angela, but she did not change anything. (June 27 P.M. Tr. at 69; Oct. 15 Tr. at 180.) Lisa was shown two reports by an FBI agent during the investigation and testified that between the two reports, she saw the report that "wasn't as long." (June 27 P.M. Tr. at 80.) Given that Roth's report was thirty-five pages long (Evid. Hearing, Ex. 4) and the report Abu-Shawish submitted to the City was twenty-two pages long (Evid. Hearing, Ex. 3), this suggests that Angela gave Lisa the altered report to proofread. At the time Lisa saw the report, there was nothing about Arabian Fest in the plan and the report did not contain a page stating that Roth prepared it. (June 27 P.M. Tr. at 80–81.)

Angela testified that Alderman Donovon instructed her to send a copy of Roth's report to Abu-Shawish so that "we could work off of the report to implement this plan." (June 28 A.M. Tr. at 138.) While Angela testified that Alderman Donovon knew that Roth's report would be sent to Abu-Shawish, she did not know whether Alderman Donovon knew that Abu-Shawish would submit Roth's report to the City as part of his block grant. (*Id.* at 131.)

Abu-Shawish received a document from Angela on a disk at the end of December 2001 or in early 2002. (June 28 A.M. Tr at 187.) Abu-Shawish testified that the document

he received from Angela on a disk contained only twenty-three pages with a blank second page. (Evid. Hearing Tr. at 60.) The document started on page 2 of Roth's plan—a page with the heading "Executive Summary." (*Id.* at 48.)

In a letter dated February 8, 2002, Abu-Shawish wrote to Hawkins requesting an extension for the Arabian Fest plan through March 31, 2002 "to finalize the work of the development plan for Muskego Avenue." (June 28 A.M. Tr at 183.) Abu-Shawish continued work on the project through March 2002, including work with the Crime Reduction Initiative, working on a database of businesses to target to move to Muskego Avenue, and traveling to Chicago to speak with Arab business owners. (*Id.* at 183–86.)

Although he received the Roth report at the end of 2001 or beginning of 2002, Abu-Shawish did not review it until May 2002. (*Id.* at 188.) Abu-Shawish testified that he believed this was a final report, drafted by Angela, as it was Angela's duty to "put all the inputs from everybody into one final report." (*Id.*) However, when Abu-Shawish began reviewing the report, he noted that it did not have one mention of Arabian Fest, the planning organization. (*Id.*) So Abu-Shawish made changes to the report before submitting it to the City on May 16, 2002, including simplifying the language (*id.* at 191) and adding an Arabian Fest cover page, the first page (a cover letter to Hawkins), and the final page in which he thanked the people he worked with on the project (Evid. Hearing Tr. at 32; Ex. 4). Abu-Shawish also inserted his organization's name—Arabian Fest—in appropriate places. (Evid. Hearing Tr. at 49.)

When federal agents conducted a search of Abu-Shawish's residence, they found three versions of the "Muskego Avenue Redevelopment Plan," none of which were longer than twenty-two pages. (Oct. 15 Tr. at 278–80.) One version matched the version submitted

as Exhibit 3 at the evidentiary hearing but did not contain Abu-Shawish's letter to Hawkins. (Case No. 03-CR-211, Trial Ex. 31A.) Another version matched Exhibit 3, except it was lacking the Arabian Fest cover page and the letter to Hawkins, had a blank page 12, and lacked the thank-you page. (Case No. 03-CR-211, Trial Ex. 31B.) This version of the document starts with the page containing the heading "Executive Summary." (*Id.*) The final version matched Exhibit 3, except it lacked the letter to Hawkins and some of the formatting was different (such as the use of color charts and the thank-you was not placed as a separate page). (Case No. 03-CR-211, Trial Ex. 31C.) A copy of the Roth plan—Exhibit 4 entered in the evidentiary hearing—was not found during the search. (Evid. Hearing. Tr. at 75.)

When Abu-Shawish requested funding for the Arabian Fest grant, he specifically requested the money to pay for three positions. (Evid. Hearing, Ex. 1.) In Abu-Shawish's contract with the City, Abu-Shawish was listed as executive director, Angela was listed as assistant developer, and Lisa was listed as office assistant. (Case No. 03-CR-211, Trial Ex. 9.) While Abu-Shawish believed that both Angela and Lisa were employees of Arabian Fest (June 28 A.M. Tr. at 171–73), he also testified that Angela and Lisa were "wearing two hats at the same time" and that he "could not define which work [was] for Arabian Fest, which one [was] for the Alliance." (Evid. Hearing Tr. at 39.) During the relevant time period, Abu-Shawish made two checks payable to Lisa and gave them to Angela. (June 28 A.M. Tr. at 172.)

Also during the relevant time period, Angela acknowledged that she was an employee of both Arabian Fest and Milwaukee Alliance; however, she testified that the terms of her employment with Abu-Shawish, as well as the amount of her salary, were dictated by Alderman Donovon. (Oct. 15 Tr. at 347–48.) Angela similarly testified that it

was not always clear if the work she was performing was for Milwaukee Alliance or for Arabian Fest. (June 28 A.M. Tr. at 130.) Angela testified that Roth's original plan had information in it that Milwaukee Alliance gave to him, such as surveys she and "her people" did about the neighborhood (*id.* at 132), however, it also included work product from Abu-Shawish (*id.* at 133). Angela understood the purpose of Abu-Shawish's $75,000.00 block grant was to bring Arabian businesses to Muskego Avenue, not to prepare a plan, and it was Alderman Donovon who talked to her about the purpose of Abu-Shawish's block grant. (*Id.* at 138.) Angela testified that the project was directed mainly by Alderman Donovon. (*Id.* at 143.)

Lisa, on the other hand, testified that she did not believe she was ever an employee of Arabian Fest—she thought she was working for Milwaukee Alliance during the relevant time period. (June 27 P.M. Tr. at 74–75.) Lisa never negotiated a salary with Abu-Shawish and Abu-Shawish never gave her specific directions on any Arabian Fest work. (*Id.* at 74.) Lisa further testified that she never received the two checks from Arabian Fest. (*Id.* at 72.) While Lisa was asked by Angela to drop a W-4 off at Abu-Shawish's accountant's office, the box containing the employer's name was blank. (*Id.* at 78–79.) A W-2 exists listing Lisa as an employee of Arab-American Festival, Inc. in 2001 and showing wages of $5,000.00, but Lisa never received this W-2. (*Id.* at 78.) Lisa's two Arabian Fest checks were cashed, however, but not by Lisa. Angela signed Lisa's name on both of the checks and deposited them into her own account. (June 28 A.M. Tr. at 142.) Angela testified that she did this because the checks were supposed to be made out to her, but Abu-Shawish said "that's the way it has to be." (Oct. 15 Tr. at 364.) Angela believed she was owed the money for work she did as a consultant for Arabian Fest. (*Id.*) Lisa was paid for her work—by Milwaukee

Alliance. (June 27 P.M. Tr. at 85.) Lisa testified that it was not clear to her what Abu-Shawish's relationship was to Milwaukee Alliance. She knew that he was the Executive Director of Arabian Fest, but to her it also seemed like he was involved in the Muskego Avenue project. (Oct. 15 Tr. at 192.) Lisa believed that both Milwaukee Alliance and Abu-Shawish got the grant, that it was "a joint event." (*Id.* at 193.)

## ANALYSIS

### 1. The Parties' Arguments

Again, to obtain a certificate of innocence under § 2513, a petitioner must prove: (1) that the court that reversed or set aside his conviction did so on the ground that he is not guilty of the offense for which he was convicted; (2) that he did not commit any of the acts charged, or that those acts or related acts constituted no crime against the United States or any state; and (3) that he did not, by misconduct or neglect, cause or bring about his own prosecution. *Abu-Shawish*, 898 F.3d at 733. As the Seventh Circuit already found, Abu-Shawish satisfies the first requirement of § 2513(a) because his conviction was reversed on the merits. Additionally, the government does not argue that he fails the third requirement. *Abu-Shawish*, 898 F.3d at 739. Thus, "Abu-Shawish's claim will succeed or fail based on the second requirement—whether his actions constituted any crime under federal or state law." *Id.* The second requirement of § 2513(a) actually contains two clauses, stated in the disjunctive. First, whether the petitioner committed any of the acts charged and second, whether those acts or related acts were criminal. As the Seventh Circuit explained, § 1495 and § 2513 are meant to compensate "only persons who are actually innocent—whether because they did not do what the indictment charged or because what they did is not a crime." *Pulungan v. United States*, 722 F.3d 983, 985 (7th Cir. 2013). A petitioner, however,

need not prove both clauses. *See Osborn v. United States*, 322 F.2d 835, 841 (5th Cir. 1963) ("Logically, it would not be justifiable to require a claimant to prove both. If he did not commit the act charged it would be immaterial whether the act was unlawful, and conversely, if the act was not criminal it should made [sic] no difference whether he had done it.").

The crux of the government's fraud theory is that Abu-Shawish plagiarized Roth's report, which the City had already paid for. Moreover, the government argues that Abu-Shawish's petition turns on his credibility. The government details Abu-Shawish's "baggage" (Gov't Pre-Hearing Br. in Opp. at 8), specifically a conviction for mortgage fraud that was based on actions that occurred in the summer or early fall of 2002, fairly close in time to the events giving rise to this case (Evid. Hearing Tr. at 44). The government points out that Abu-Shawish was also investigated for passport and visa fraud (*id.* at 76) and was alleged to have altered a critical document prior to submitting it to the small claims court (*id.* at 54). The government further argues that an immigration judge questioned Abu-Shawish's credibility during a 2008 immigration proceeding. (*Id.* at 45.) In short, the government argues that Abu-Shawish has zero credibility.

Abu-Shawish asserts that he did not know the report was Roth's work at the time he made his alterations and submitted the document to the City. Abu-Shawish testified that he never saw Roth's complete report prior to his criminal case (June 28 A.M. Tr. at 189, Trial Ex. 26) and that he was unaware that Roth was hired by Milwaukee Alliance to prepare a written report (*id.* at 205).

Following the Seventh Circuit's lead, both Abu-Shawish and the government confine their arguments to whether Abu-Shawish had an intent to defraud, a necessary element for

wire fraud under 18 U.S.C. § 1343, mail fraud under 18 U.S.C. § 1341, and transporting goods obtained by fraud under 18 U.S.C. § 2314.[2] To act with intent to defraud means to act "willfully and with specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Henningsen*, 387 F.3d 585, 590–91 (7th Cir. 2004) (internal citation omitted). "Proof of intent to defraud is often proven through circumstantial evidence or by inferences drawn from the scheme itself." *Id.* at 591. The Seventh Circuit pattern jury instructions provide that "intent to defraud" means "the acts charged were done knowingly with the intent to deceive or cheat the victim in order to cause a gain of money or property to the defendant or the potential loss of money or property to another." *United States v. Lillie*, 669 F. Supp. 2d 903, 906–07 (N.D. Ill. 2009) (internal quotation marks omitted).

2. *Record Evidence*

With the jury instruction for intent to defraud in mind, I turn to the record in this case. Undeniably, Abu-Shawish comes before the Court with heavy baggage. It is also undeniable that he has a financial stake in these proceedings. However, Abu-Shawish's assertions must be weighed and assessed in light of the entire record, including evidence from both of his criminal trials and the evidentiary hearing conducted on Abu-Shawish's petition. Accordingly, despite Abu-Shawish's credibility deficits, an examination of the record, particularly the testimony Angela and Lisa Sanfilippo, supports Abu-Shawish's

---

[2]In its post-hearing brief, the government also suggests that perhaps Abu-Shawish is guilty of misappropriation of the trade secrets of Roth, the Endeavor Group, and/or Milwaukee Alliance pursuant to Wis. Stat. Ann. § 943.205(1)(a) & (3) and Wis. Stat. Ann. § 134.90. But again, Wis. Stat. § 943.205 requires "intent to deprive or withhold from the owner thereof the control of a trade secret" or "intent to appropriate a trade secret to his or her own use or the use of another not the owner, and without authority of the owner." Thus, even under this theory, whether Abu-Shawish is entitled to a certificate of innocence still rests on the question of his intent.

assertion that he had not seen Roth's report and did not know that the report he submitted to the City was originally prepared by Roth. I will address the key evidence below.

### 2.1 The evidence does not show that Abu-Shawish knew that Roth was preparing a report for Milwaukee Alliance

It appears there were two Muskego Avenue projects going on at the same time in 2001. First, there was Alderman Donovon's plan to revitalize the entire Muskego Avenue corridor through his non-profit organization Milwaukee Alliance. Angela, acting as an employee of Milwaukee Alliance, contacted Roth in March 2001 regarding retaining his company to create a blueprint to revitalize the corridor. (Oct. 15 Tr. at 209–12.) Roth agreed to do this work for $25,000.00, but Milwaukee Alliance did not have the funds to pay his up-front fee of $12,500.00. (*Id.* at 247.) Nonetheless, Roth began working on the project and did not sign a contract with Milwaukee Alliance until July or August 2001. (*Id.* at 212–13, 238; June 27 P.M. Tr. at 25–26).

Abu-Shawish also had an idea in early 2001—to create an Arabic business community on Muskego Avenue in Milwaukee. Unlike Alderman Donovon's more expansive plan, Abu-Shawish's plan was to revitalize a portion of the Muskego Avenue corridor, specifically the section of Muskego Avenue between Mitchell Street and Burnham Street. (June 28 A.M. Tr. at 166.) Abu-Shawish approached the district's newly elected Alderman Donovon regarding his idea. (*Id.* at 156.) Alderman Donovon was enthusiastic about Abu-Shawish's idea and suggested that he speak to the CDBG division about obtaining funding. (*Id.* at 156–57.)

But Alderman Donovon too was looking for funding from the CDBG division for Milwaukee Alliance's Muskego Avenue project. Roth was getting nervous that he was not going to get paid. (Oct. 15 Tr. at 246.) Roth was so nervous that he called Angela on a

biweekly basis to inquire about the status of the project's funding. (*Id.*) Angela assured Roth that the money was coming. (*Id.* at 247–48.) Meanwhile, Abu-Shawish heeded the alderman's advice and contacted the CDBG division in April 2001. (June 28 A.M. Tr. at 157.) In June 2001, a meeting was held on Abu-Shawish's proposal at which Alderman Donovon advocated on Abu-Shawish's behalf, despite the rarity of an alderman making a case for a grant. (*Id.* at 159–60; Oct. 14 Tr. at 128–29.) Abu-Shawish's $75,000.00 grant was approved on June 20, 2001. (June 28 A.M. Tr. at 160.) Alderman Donovon also ultimately obtained a block grant in August 2001 for Milwaukee Alliance in the amount of $200,000.00. (Oct. 14 Tr. at 98.)

By the end of the summer of 2001, both Muskego Avenue projects—Alderman Donovon's and Abu-Shawish's—were underway. Multiple meetings were held between Alderman Donovon, Angela, Roth, and Abu-Shawish about "the project" from June to December 2001. (June 28 A.M. Tr. at 129.) But the line between the two projects was so completely blurred that what is clear from the evidence is that Roth had one understanding of what the "project" entailed and Abu-Shawish had another. Roth understood that Alderman Donovon was working with Abu-Shawish to create an Arab-American business district within the revitalization of the Muskego Avenue corridor project. (June 27 P.M. Tr. at 34–36.) He thought Abu-Shawish was an important stakeholder in the project (*id.*) but did not believe that Abu-Shawish was in control of an independent project. Roth testified that he thought an Arab-American district was a bad idea, given the ethnic make-up of the area (Oct. 15 Tr. at 217); however, not wanting to upset his clients, he "compromised" by creating an "International Theme Development" section in his report, which Roth described as coming about as an "off-shoot" of his meetings with Abu-Shawish (*id.* at 225). Roth's

report itself confirms his understanding, including his testified skepticism about the success of an Arab-American district. For example, he writes: "Milwaukee Alliance should support this effort for a predetermined amount of time. If it cannot be created, the Milwaukee Alliance should focus on some other type of specialty district." (Evid. Hearing, Ex. 4 at 29.)

Abu-Shawish, on the other hand, believed that Roth was brought in by Alderman Donovon and Angela to help Abu-Shawish with his project. He testified that Roth's role was to conduct research that would be incorporated into Arabian Fest's strategy to recruit Arabic businesses to the area. (June 28 A.M. Tr. at 165–66.) Abu-Shawish testified that he was unaware of Roth's contract with Milwaukee Alliance or that Roth had been tasked with completing a written report for Milwaukee Alliance. (*Id.* at 205.) Roth's testimony regarding the substance of their meetings supports Abu-Shawish's belief. Roth testified that there were discussions at the meetings about Arab-American business recruitment and that he gave suggestions to Alderman Donovon and Abu-Shawish on the approach to use. (Oct. 15 Tr. at 218.) There is no testimony, however, from any of the participants of the meetings that Roth's contract with Milwaukee Alliance or preparation of his report for Milwaukee Alliance was ever discussed. Thus, there is no evidence that Abu-Shawish knew about Roth's report.

### 2.2 The evidence does not show that Abu-Shawish ever received Roth's complete report

There is also no evidence that Abu-Shawish ever received Roth's original report. Abu-Shawish testified that he never saw Roth's complete report prior to his criminal case. (June 28 A.M. Tr. at 189, Trial Ex. 26.) The record evidence supports his testimony. Angela testified that she received Roth's report, which is dated December 2001, sometime in the last quarter of 2001. (June 28 A.M. Tr. at 130–31.) The government argues that Angela "clearly

testified that she gave Abu-Shawish 'the complete report' in electronic form." (Gov't Post-Hearing Br. at 8, 11, Docket # 341 (citing June 28 A.M. Tr. at 136).) While the government correctly cites Angela's testimony on page 136, it does not acknowledge that only a few questions later, Angela quickly backtracks. Angela was asked the following: "In the versions that were sent to Mr. Abu-Shawish, did you take anything out?" (*Id.* at 137.) Angela responded: "I know - - I think you're looking for a yes or no answer, but I know that we had taken out the - - the plan from Randy Roth was very Milwaukee Alliance top heavy, and we wanted to be able to bring other entities into this plan. It wasn't just a Milwaukee Alliance plan. It was a community plan. And I did take Milwaukee Alliance out of the plan." (*Id.*)

During the second trial, Angela testified that Alderman Donovon liked some of Roth's plan, but disliked other parts. (Oct. 15 Tr. at 355.) Angela testified that Alderman Donovon instructed her to take out "a lot of the Milwaukee Alliance verbiage and make it non-specific to one group." (*Id.*) Angela testified that she made the alterations to the report on a computer. (*Id.*) Angela acknowledged that she made the changes to Roth's report that Alderman Donovon requested and then sent the report to Abu-Shawish at Alderman Donovon's request so that "we could work off of the report to implement this plan." (June 28 A.M. Tr. at 138.) Angela testified that she did not have anything to do with the plan after she sent it to Abu-Shawish. (*Id.* at 137.) Thus, Abu-Shawish clearly received an altered form of Roth's report from Angela that would not have suggested it was written for Milwaukee Alliance.

Further supporting this, before Roth's report was sent to Abu-Shawish, Angela had Lisa proofread it. (June 27 P.M. Tr. at 69; Oct. 15 Tr. at 180.) Lisa made no changes to the report. (*Id.*) At trial, Lisa was confronted with her grand jury testimony, in which an FBI

agent showed her two different plans (one that had "many more pages" than the other) and she stated that the one she saw was the "shorter" one and that it appeared people were working on it at the time. (June 27 P.M. Tr. at 80.) Abu-Shawish's report was approximately thirteen pages shorter than Roth's report, suggesting that Lisa only ever saw the altered report. Thus, Lisa's testimony corroborates that Abu-Shawish never received Roth's original report. Angela and Lisa's testimonies are further supported by the fact that Roth's complete report was not found during the search of Abu-Shawish's residence. For these reasons, the record supports that Abu-Shawish never received Roth's original report.

### 2.3 The evidence of the similarity between the reports does not in itself evidence fraud

Looking at Roth's report and Abu-Shawish's report side-by-side, it is abundantly clear that Abu-Shawish's report is an altered version of Roth's report. This is very compelling evidence against Abu-Shawish. However, the critical question is not the similarity of the two reports, but what Abu-Shawish knew at the time that he submitted his report to the City. Abu-Shawish believed that he was working on a project with Alderman Donovon, Roth, Angela, and Lisa. He believed that the report he submitted was drafted by Angela, who was tasked with combining everyone's input into one final report. (June 28 A.M. Tr. at 188, 190–91.) Abu-Shawish's belief is supported by the record evidence. Angela testified that the report was a "collective plan," containing information from Roth, as well as from "other groups." (*Id.* at 133.) She testified that Abu-Shawish's work product was present in the report, as well as the work product of Milwaukee Alliance people. (*Id.* at 132–33.) When Abu-Shawish was shown the demographics chart on page 6 of the report and was asked whether Angela prepared it, he acknowledged that the chart was provided by Roth during one of their meetings. (*Id.* at 208.) This evidence supports Abu-Shawish's

testimony that he believed the report was the culmination of multiple people's work, not that he knowingly plagiarized Roth's report.

Fraudulent intent is often proven by inferences from the scheme itself. As to the report Abu-Shawish submitted to the City, he testified that he made changes to the report before submitting it to the City—simplifying the language (June 28 A.M. Tr. at 191), adding an Arabian Fest cover page, adding the first page (a cover letter to Hawkins), adding the final page in which he thanked the people he worked with on the project (Evid. Hearing Tr. at 32, Ex. 4), and inserting his organization's name—Arabian Fest—in appropriate places. (Evid. Hearing Tr. at 49.) Abu-Shawish then submitted the report to the City. (Evid. Hearing, Ex. 3.) At sentencing, Judge Stadtmueller observed that Abu-Shawish did not provide "$75,000 of added value to the plagiarized work of Randy Roth." (Transcript of Jan. 31, 2006 Sentencing in Case No. 03-CR-211 at 22, Docket # 287.) That appears true.

However, the City was not paying Abu-Shawish $75,000.00 to simply write a report. The purpose of the $75,000.00 grant was to develop a business plan to recruit new Arab owned businesses along Muskego Avenue. (Evid. Hearing Tr. at 19.) Even if the work Abu-Shawish completed on the written report was arguably not worth $75,000.00, the evidence does not support that the project itself was not worth $75,000.00. Abu-Shawish testified that as president of Arabian Fest, which put on the only Arab-American festival in the United States, Abu-Shawish was in the public eye and was politically active. (Evid. Hearing Tr. at 12–13, 24.) Abu-Shawish used the success of his festival to attempt to recruit Arab owned businesses to Muskego Avenue. (*Id.*) He traveled to Chicago twice a month to recruit Arab businesses during the course of the project. (*Id.* at 24.) He also conducted pedestrian and vehicle counts on Muskego Avenue to understand the potential customer base for the area

and conducted crime reduction walks to assist in making the area safer and thus more attractive to new businesses. (June 28 A.M. Tr. at 167–71; Evid. Hearing Tr. at 23–25.) Further evidence that the grant was not just to write a report is the extension that Abu-Shawish received on the project. The project initially was to be completed by the end of 2001, and Abu-Shawish received the report from Angela in late 2001 or early 2002. However, Abu-Shawish testified that because he was still performing work on the project in 2002, he asked for an extension in February 2002 "to finalize the work of the development plan for Muskego Avenue." (June 28 A.M. Tr. at 183.) His report to the City was not submitted until May 2002. Additionally, the $75,000.00 grant also contemplated salaries for Angela and Lisa. Thus, the scheme does not lend itself to an inference of fraudulent intent.

Moreover, the alleged fraud does not turn on the quality of Abu-Shawish's report, but on whether he knew that he was plagiarizing Roth's report. Thus, the amount of writing Abu-Shawish did or did not perform on the report itself does not evidence an intent to defraud. Abu-Shawish believed it was his job to supervise his employees and volunteers and work his connections in the Arab-American business community to recruit businesses to the area. (Evid. Hearing Tr. at 21–22.) He thought it was Angela's job to draft the report for the City and that he would "put [his] touches on it, finalize it" before submitting it to the City. (Evid. Hearing Tr. at 61.) For there to be fraudulent intent, Abu-Shawish must have known that the report was prepared by Roth or someone other than his own employee acting on his behalf. The evidence supports his assertion that he did not know this. Simply delegating the drafting of the report to his employee does not evidence fraud.

2.4 The evidence does not support that Abu-Shawish deliberately avoided knowing that the report was prepared by Roth

I have given great consideration as to whether this is a case of conscious avoidance on the part of Abu-Shawish. *See, e.g.*, *United States v. Carrillo*, 435 F.3d 767, 779–85 (7th Cir. 2006) ("For purposes of criminal liability, deliberately avoiding knowledge of a criminal activity is the same thing as having actual knowledge of that activity."). In other words, I have considered whether Abu-Shawish remained deliberately ignorant of the fact that Roth was preparing a report and that the report he received from Angela was actually a report prepared by Roth. Weighing in favor of finding that Abu-Shawish acted with willful ignorance are the multiple meetings Abu-Shawish attended with Roth and Alderman Donovan and the fact that when Abu-Shawish received the draft report from Angela, it did not mention Arabian Fest despite the fact it was Arabian Fest's project. (June 28 A.M. Tr. at 188.) However, the record is devoid of evidence that Abu-Shawish knew, or from which I can reasonably infer that he knew, Roth's role included preparation of a report or a written plan. Angela testified that she provided Abu-Shawish with an altered version of Roth's report. Lisa did not remember seeing anything on the version of the report she proofread (prior to Abu-Shawish receiving it) indicating that Roth prepared it. (June 27 P.M. Tr. at 81.) In other words, if the record were to show that Abu-Shawish knew that Roth was preparing a written plan rather than merely consulting and giving feedback and advice at meetings, or if the evidence showed that the report that Abu-Shawish received contained references to Roth's company or Roth's contract with Milwaukee Alliance, there would be evidence to infer that Abu-Shawish was deliberately putting his head in the sand as to the original author of the report. However, on the existing record, there is no evidence that

Abu-Shawish knew, or even should have suspected, that Angela's report was really Roth's report.

## RECOMMENDATION

To obtain a certificate of innocence in this case, Abu-Shawish must prove, by a preponderance of the evidence (i.e., more likely than not), *see United States v. Breland*, 356 F.3d 787, 795 (7th Cir. 2004), that he did not act willfully and with the specific intent to deceive or cheat for the purpose of getting financial gain and causing the City financial loss, *see Henningsen*, 387 F.3d at 590–91. This is a high bar to meet and for this reason, certificates of innocence are rarely granted. Acquittal is not sufficient; Abu-Shawish must show actual innocence. Assessing actual innocence in intent to defraud cases is particularly difficult. There is no scientific test that can be performed to assess someone's intent and determine if he or she is actually innocent. Rather, proof of intent to defraud is assessed through examination of circumstantial evidence and inferences to be drawn from the evidence.

Here, after examining the transcripts from both trials and considering the testimony from the evidentiary hearing, I find that Abu-Shawish has proven, by a preponderance of the evidence, that he did not act with the specific intent to deceive the City for financial gain. The line between Alderman Donovon's project and Abu-Shawish's was clearly blurred, but not by Abu-Shawish. It was Alderman Donovon who instructed Angela to alter Roth's report, making it for "general" use by multiple groups. Alderman Donovon instructed Angela to send Roth's report to Abu-Shawish for his use, which she did, but only after removing the references to Milwaukee Alliance. Abu-Shawish simply did exactly what Alderman Donovon intended him to do—use Roth's report for his own organization. However, there is no evidence that Abu-Shawish knew Roth drafted the report Angela sent

him or that the report was meant for Milwaukee Alliance. Angela's testimony supports Abu-Shawish's testimony that he believed the report he received from Angela was the culmination of multiple people's work compiled by Angela. Roth's completed report was not found in Abu-Shawish's residence. Only Alderman Donovon and Angela were privy to the fact that Roth had a contract with Milwaukee Alliance and Roth drafted the report. Abu-Shawish did not know Roth drafted the original report or that he was receiving a version of Roth's original report from Angela. He believed that Angela, his assistant developer, prepared the report and provided it to him to polish before submitting it to the City.

For these reasons, I find that Abu-Shawish has proven, by a preponderance of the evidence, that he did not act with the specific intent to defraud the City for financial gain. Therefore, I recommend Abu-Shawish be granted a certificate of innocence.

**NOW, THEREFORE, IT IS RECOMMENDED** that Abu-Shawish's petition for a certificate of innocence be **GRANTED**.

Your attention is directed to General L.R. 72(c), 28 U.S.C. § 636(b)(1)(B) and Federal Rules of Criminal Procedure 59(b), or Federal Rules of Civil Procedure 72(b) if applicable, whereby written objections to any recommendation or order herein, or part thereof, may be filed within fourteen days of the date of service of this recommendation or order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated at Milwaukee, Wisconsin this 10th day of December, 2019.

BY THE COURT

_s/Nancy Joseph_____
NANCY JOSEPH
United States Magistrate Judge