# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

              Plaintiff,

v.

MHAMMAD A. ABU-SHAWISH,

              Defendant.

Case No. 03-CR-211-1-JPS

**ORDER**

## 1.    BACKGROUND

This case comes before the Court on defendant Mhammad A. Abu-Shawish ("Abu-Shawish")'s motion for a certificate of innocence. (Docket #306). In 2006, Abu-Shawish was convicted in a jury trial before Judge J.P. Stadtmueller of federal program fraud in violation of 18 U.S.C. § 666(A)(1)(A). Abu-Shawish had received $75,000.00 from the City of Milwaukee to work on an Arab-American business development plan for Muskego Avenue. At the end of the project, Abu-Shawish submitted a report on behalf of his organization, which purported to be the sum total of the organization's efforts under the grant. However, Abu-Shawish's report was actually written by an individual who had already been paid $25,000.00 by the City of Milwaukee to draft the report for another closely related organization. The jury determined that Abu-Shawish plagiarized the report with intent to defraud the City of Milwaukee. Abu-Shawish was sentenced to a three-year term of imprisonment, which he served in full.

In 2007, the Seventh Circuit vacated Abu-Shawish's conviction and remanded the case for a new trial on the grounds that the indictment had not properly alleged federal program fraud. *United States v. Abu-Shawish*,

507 F.3d 550 (7th Cir. 2007) ("*Abu-Shawish I*"). After determining that federal program fraud would have required Abu-Shawish to be an agent of the City of Milwaukee—which he was not—the Seventh Circuit noted, in dicta, that "[w]ithout question, the indictment properly alleged and the evidence was sufficient to show that Abu-Shawish defrauded the City of Milwaukee. . .but the government is still required to charge him with the appropriate crime." *Id.* at 558. It noted that Abu-Shawish might have been charged with mail or wire fraud, instead. *Id.*

In light of that observation, the government indicted Abu-Shawish for three counts of mail and wire fraud. The case proceeded to trial again, this time before Judge Rudolph Randa. The trial consisted of substantially the same subject matter, witnesses, and evidence—the main difference, aside from the charges, was the fact that Abu-Shawish did not testify on his own behalf. At the end of the trial, the jury acquitted Abu-Shawish. Case No. 07-CR-289 (Docket #43).

Abu-Shawish now seeks a certificate of innocence so that he can bring suit against the government for damages related to the original overturned criminal conviction, for which he served a full prison sentence. Initially, the Court summarily denied Abu-Shawish's petition in light of the Seventh Circuit's acknowledgment that "the evidence was sufficient to show that Abu-Shawish defrauded the City of Milwaukee." *Abu-Shawish I*, 507 F.3d at 558. The Court believed that it was "constrained to find that Abu-Shawish ha[d] not met his burden," notwithstanding the subsequent acquittal. (Docket #311 at 9).

Abu-Shawish appealed the Court's initial denial, and in 2018 the Seventh Circuit vacated the Court's order and remanded the case for additional proceedings. *Abu-Shawish v. United States*, 898 F.3d 726, 737 (7th

Cir. 2018) ("*Abu-Shawish II*"). The Seventh Circuit instructed the Court to "give the United States an opportunity to respond to [Abu-Shawish's] petition," then "take a fresh look at all the relevant evidence and make a 'determination independent of the outcome of the trial or appeal.'" *Id.* (quoting *Betts v. United States*, 10 F.3d 1278, 1283 (7th Cir. 1993)). In so doing, the Seventh Circuit instructed that the Court "must give both sides the opportunity to submit evidence." *Id.* at 739. In the event that Abu-Shawish "decline[d] to submit additional evidence—by affidavit or otherwise—the district court could properly resolve the petition based on the trial records alone." *Id.* In either scenario, "when the court decides the case on the merits, it will need to explain its ultimate decision with reviewable findings of fact under [Federal Rule of Civil Procedure] 52." *Id.* at 740. Rule 52(a) requires courts making findings of fact and law to "find the facts specially and state its conclusions of law separately."

Upon receiving this mandate, the Court promptly issued a briefing schedule. (Docket #325). Once the petition was fully briefed, the Court referred the case to Magistrate Judge Nancy Joseph with instructions to conduct an evidentiary hearing on Abu-Shawish's credibility, specifically with regard to the issue of whether he plagiarized the report with intent to defraud the City of Milwaukee. (Docket #335). Magistrate Judge Joseph conducted an evidentiary hearing and received post-hearing briefing on the issue. (Docket #339, #340, #341, #342). After considering the parties' arguments, the evidentiary hearing, and the underlying records of Abu-Shawish's two prior criminal trials, Magistrate Judge Joseph drafted a Report and Recommendation ("R&R") in which she concluded that Abu-Shawish's petition for a certificate of innocence should be granted. (Docket #344).

While this conclusion is broader in scope than the Court's original request, it is very instructive because Abu-Shawish's credibility is intertwined with the other evidence in the record. Additionally, the issue of whether to grant the petition for a certificate of innocence depends on whether Abu-Shawish is telling the truth when he claims he did not intend to plagiarize the report in question. Therefore, the Court will use Magistrate Judge Joseph's conclusions as a basis for its own conclusions, subject to the objections raised by the government, which are fully briefed, and which will be discussed below.

The government objected to Magistrate Judge Joseph's review on the grounds that (1) it failed to properly apply the appropriate burden of persuasion required of litigants seeking certificates of innocence; and (2) the record did not support a finding that Abu-Shawish was, in fact credible. (Docket #345 at 1). Abu-Shawish responded to these objections, (Docket #346), and the government has not replied. For the reasons explained below, Magistrate Judge Joseph's R&R will be adopted.

2.      **LEGAL STANDARD**

    2.1     **Magistrate Review**

    When reviewing a magistrate's recommendation, this Court is obliged to analyze *de novo* "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The Court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.* The Court's review encompasses both the magistrate's legal analysis and factual findings. *Id.*; *see also* Fed. R. Crim. P. 59(b).

### 2.2 Petitions for Certificates of Innocence

In a rare exception to sovereign immunity, Congress has given the Federal Court of Claims jurisdiction over "any claim for damages by any person unjustly convicted of any offense against the United States and imprisoned." 28 U.S.C. § 1495. However, before a person seeking monetary damages can file suit in the Federal Court of Claims, he must obtain a certificate of innocence from the court in which he was originally convicted. *Abu-Shawish II*, 898 F.3d at 733. To do this, he must allege and subsequently prove:

> First. . .that the record of the court setting aside or reversing his conviction demonstrates that the court did so on the ground that he is not guilty of the offense for which he was convicted. Second, the petitioner must prove that he did not commit any of the acts charged, or that those acts or related acts constituted no crime against the United States, or any State, Territory or the District of Columbia. Third, the petitioner must demonstrate that he did not by misconduct or neglect cause or bring about his own prosecution.

*Id.* (quoting *United States v. Mills*, 773 F.3d 563, 566 (7th Cir. 2014)); 28 U.S.C. § 2513(a). Acquittal is not enough to receive relief under these statutes. Sections 1495 and 2513 compensate "only persons who are actually innocent—whether because they did not do what the indictment charged or because what they did is not a crime." *Pulungan v. United States*, 722 F.3d 983, 985 (7th Cir. 2013).

A petitioner bears "the burdens of production and persuasion" by demonstrating, by a preponderance of the evidence, that he is innocent of any crime that could have been charged. *Id.* at 986; *Abu-Shawish II*, 898 F.3d at 733. In other words, he must convince the original court that it is "more probably true than not true" that he is innocent. *See* Seventh Circuit Pattern Civil Jury Instruction, 34 (rev. 2017) (giving instruction for "preponderance

of the evidence"); *see also id.*, (quoting *In re Winship*, 397 U.S. 358, 371 (1970) (Harlan, J., concurring) ("preponderance of the evidence. . .simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence")). Because a certificate of innocence issued under Section 2513(a) is a precursor to a damages suit against the government, courts should construe Section 2513 strictly. *Abu-Shawish II*, 898 F.3d at 733 (citing *United States v. Graham*, 608 F.3d 164, 172 (4th Cir. 2010)).

In this case, the parties do not dispute that Abu-Shawish was acquitted by a jury and that he did not assist in bringing about his prosecution, as required by the first and third elements of Section 2513(a). Therefore, Abu-Shawish's innocence petition turns on whether he has shown by a preponderance of the evidence "that he did not—in fact—commit a crime," including any other crime arising from his purported acts, deeds, or omissions. *Abu-Shawish II*, 898 F.3d at 739.

**3.    FINDINGS OF FACT**

### 3.1    Milwaukee Alliance/Arabian Fest

The government does not object to the majority of Magistrate Judge Joseph's extremely comprehensive findings of fact—only her application of the burden of proof and her conclusion that Abu-Shawish was credible. Therefore, many of the uncontested facts from her R&R will be relied upon and incorporated herein. Magistrate Judge Joseph's findings of fact are based on transcripts and submissions from the 2005 trial before Judge Stadtmueller, the 2007 trial before Judge Randa, Abu-Shawish's affidavit in support of his petition for a certificate of innocence, and the evidentiary hearing held before her on July 30, 2019. The Court has also included additional details that are relevant to determinations of Abu-Shawish's

credibility, including statements from Abu-Shawish's sentencing hearing in 2006.

Abu-Shawish was a restaurant owner and the director of Milwaukee's Arabian Fest from 1997 to 2002. He was relatively successful in bringing the Arab community in Wisconsin and northern Illinois to Milwaukee to celebrate Arabian Fest. This story begins in early 2001, when Abu-Shawish approached the newly elected Milwaukee Alderman Robert Donovan ("Donovan") with an idea to revitalize South Muskego Avenue with Arab-owned businesses. Abu-Shawish had a dream of developing an Arab cultural hub akin to Chinatown in New York or Kedzie Street in Chicago. Donovan, who was heavily involved in various revitalizing initiatives on the south side of Milwaukee, supported Abu-Shawish's plan. Donovan encouraged Abu-Shawish to apply for a grant through the Community Development Block Grant ("CDBG") of Milwaukee.

Donovan ran his own organization called the "Milwaukee Alliance," which supported community-driven revitalization efforts in his district, which included the Muskego Avenue corridor that Abu-Shawish was interested in. Through Milwaukee Alliance, Donovan employed Angela Sanfilippo ("Angela") and her sister, Lisa Sanfilippo ("Lisa") to do administrative work. Around the time that Abu-Shawish began to apply for funding for his Muskego Avenue idea, Angela recruited University of Wisconsin-Milwaukee professor Randy Roth to serve as a redevelopment consultant for Milwaukee Alliance, with a specific focus on Muskego Avenue. Case No. 07-CR-289 (Docket #45 at 73:12–74:11, 104:1–7).[1]

---

[1]For the purposes of this Order, page numbers will refer to the docket page numbers, rather than the transcript's page numbers. The line numbers refer to the lines on the transcript. Additionally, unless signaled otherwise with a case name or a prefatory "*id.*," all docket citations are to case number 03-CR-211.

In the summer of 2001, after Roth had already begun work on the project, Roth formally contracted with Milwaukee Alliance to draft a report containing his findings for a total fee of $25,000. *Id.* at 100:9–12. Roth typically required payment of half of his fee upfront, but Milwaukee Alliance did not have enough money for an upfront payment, and indeed had experienced some difficulty securing funding for the plan. *Id.* at 105:6–7, 109:13–22. Therefore, Roth commenced his work for Milwaukee Alliance without a clear sense of when or how he would be paid.

Roth met Abu-Shawish several times in the course of his work. At their first meeting, Abu-Shawish was identified as an "important player" in the Muskego Avenue project. (Docket #274 at 34:19–35:3); Case No. 07-CR-289 (Docket #45 at 107:11–12) (identifying Abu-Shawish as a "stakeholder" who was present at the redevelopment meetings). Working off of Abu-Shawish's dream for Muskego Avenue, Donovan specifically told Roth to include an Arabian themed development and commercial district in his plan. Case No. 07-CR-289 (Docket #45 at 114:17–115:1). Roth privately told Angela and Donovan that he did not think Muskego Avenue could be developed into an Arabian hub given the vibrant Latino community already there. *Id.* at 115:2–18.

Meanwhile, at Donovan's encouragement, Abu-Shawish submitted his grant proposal to CDBG. His proposal took the form of a letter to Juanita Hawkins, the Director of CDBG, and outlined his plans in the following terms:

This letter is to request funding for our Business Development plan. We will be working with Alderman Bob Donovan and the cooperation of Department of City Development and other local Community Organizations to put a plan together, this plan will include:

- Recruit new businesses to open a long Muskego Ave.
- Relocate other business a long that Area.
- Facilitate and maintain the relationship between businesses and neighborhood.
- Work with businesses and residents to create a beautiful and safe neighborhood.

We are requesting the a mount of $100,000 in order to hire three positions to carry out this plan, the Block Grant Funds will be used to pay for these positions. These positions are Neighborhood Development Coordinator, Executive Director and Office Manager. With your support we will build a better environment for our communities.

Thanks for your consideration, looking forward to working with you.

(Docket #339 at 17, Ex. 1).

Abu-Shawish's proposal was discussed at a meeting of the Common Council on June 19, 2001. (Docket #292 at 45:18–24). Both Abu-Shawish and Donovan attended the meeting, and Donovan advocated vigorously on Abu-Shawish's behalf—which, according to the Milwaukee City Comptroller at the time, was rare. Case No. 07-CR-289, (Docket #44 at 128:21–129:1). On June 20, 2001, Abu-Shawish received a $75,000.00 grant from the City of Milwaukee for "the following activity: Planning. Develop a business plan to recruit new businesses along Muskego Avenue." (Docket #339 at 19:10–14).

Meanwhile, Roth was growing concerned about whether he would be paid for his efforts. Case No. 07-CR-289 (Docket #45 at 108:13–25). He called Angela on a biweekly basis to inquire after the project's funding status. *Id.* At the first trial, Roth testified that he was paid through the

Milwaukee Alliance, which had been funded from a block grant through Potawatomi Casino. (Docket #274 at 38:13–19). At the second trial, Roth explained that he believed he was funded through the Potawatomi Casino, but he never actually confirmed or questioned the source of his funding. Case No. 07-CR-289 (Docket #45 at 109:23–110:6). As it happened, by August 2001, Milwaukee Alliance had a received a $200,000.00 block grant from CDBG. *Id.* (Docket #44 at 98:1–7).

For Abu-Shawish's $75,000.00 project, which went under the name "Arabian Fest," Donovan referred Angela and Lisa—who, recall, were also employed by Milwaukee Alliance—to work with Abu-Shawish. From this grant, Abu-Shawish paid himself an annual salary of $43,400.00, which is within range of typical executive non-profit salaries. *Id.* at 103:11–13. Angela was designated an assistant developer and received a salary of $15,000.00, and Lisa was designated an office assistant and received a salary of $5,000.00. *Id.* at 106:7–18; *Id.* (Docket #45 at 210:13–15). The grant funded "planning," which included, "recruiting, relocating, [and] beautify[ing]." *Id.* (Docket #44 at 104:1–6). Abu-Shawish stressed that his project would be a team initiative, and that he relied on his staff members—especially those who spoke English better than he did—to round out his vision. (Docket #292 at 45:4–14).

As part of his Muskego Avenue "planning" undertaking, Abu-Shawish joined the Crime Reduction Initiative with Donovan and regularly met with various business owners and people in the neighborhood in an effort to drum up support and enthusiasm for the Arab-American hub. He also delegated tasks to Angela, Lisa, and various volunteers who conducted litter pick-ups and inventories of the buildings on Muskego Avenue, as well as pedestrian and traffic counts. Angela and Lisa compiled this information

in a database, which was ultimately used by Roth in his report on the area. (Docket #292 at 57:5–8); Case No. 07-CR-289, (Docket #45 at 85:6–86:2) (Roth summarizing the work that Angela and other Milwaukee Alliance volunteers did for the report).

Although Angela and Lisa were salaried in part by Arabian Fest, they were also paid by Milwaukee Alliance, and continued to work out of the Milwaukee Alliance office. Case No. 07-CR-289 (Docket #45 at 59:15–60:7). Lisa took her instructions from Angela who, in turn, looked to Donovan as her supervisor, even on matters concerning Arabian Fest. *See e.g. id.* at 210:4–21. Moreover, although Arabian Fest issued a tax document for Lisa, Lisa claims to have never received her checks from Arabian Fest. It was later determined that Angela had kept them for herself, believing that they were meant for her. (Docket #292 at 28:2–9); Case No. 07-CR-289 (Docket #45 at 226:3–20). Lisa testified that she was unclear about what Abu-Shawish's relationship was to Milwaukee Alliance. Case No. 07-CR-289 (Docket #45 at 54:8–16). She testified that she believed that Milwaukee Alliance and Arabian Fest were "a joint event," and that they both were functioning under the same grant. *Id.* at 55:4–8.

Between June and December, 2001, Donovan, Roth, Angela, and Abu-Shawish attended several meetings together that focused on the Muskego Avenue development project. In late 2001, Roth gave the Milwaukee Alliance his final, written report ("the Roth Report") for circulation. The Roth Report included the data that Angela and Lisa had compiled for Abu-Shawish's project. (Docket #292 at 18:12–19:11). Angela describes the Roth Report as "a collective plan" that included "work product not just from [Roth] and his company, but also from. . .Abu-Shawish." *Id.* at 19:9–11. Donovan instructed Angela to send the Roth

Report to Abu-Shawish so that he could "work off" of it, although it is unclear what exactly this meant. *Id.* at 24:9–19. Roth was never told that his plan was going to be used by Abu-Shawish. Roth envisioned that his report would be distributed throughout the district for review, but never consented to Abu-Shawish or Arabian Fest adopting it as their own work product.

At Donovan's instruction, before giving the report to Abu-Shawish, Angela deleted references to Milwaukee Alliance in order to make the plan more generally applicable to any revitalization group, including Arabian Fest. Case No. 07-CR-289, (Docket #45 at 217:2–218:19). Angela explains that "Donovan gave a copy of [the Roth Report], to Abu-Shawish. I knew the plan was going to be submitted by Arabian Fest. I believe that [Donovan] did know that it was going to be used by Arabian Fest, and that was going to be part of the project that we were working on to implement the plan." (Docket #292 at 18:2–8); *see also id.* at 24:9–14. Donovan instructed Angela to "take out a lot of the Milwaukee Alliance verbiage and make it non-specific to one group." Case No. 07-CR-289, (Docket #45 at 217:6–7).

Angela therefore altered the report so that it did not contain many references to Milwaukee Alliance, and shortened it so that it could be applied by any group. Lisa proofread the newly edited report. When Lisa was given two reports by the FBI—Roth's thirty-five page original and the twenty-two-page altered report that was submitted by Abu-Shawish—Lisa testified that she saw the shorter one. (Docket #274 at 80:6–81:14). As Magistrate Judge Joseph concluded, this suggests that Lisa proofread the version that Angela shortened and subsequently gave to Abu-Shawish. According to Lisa, the version that she read did not contain any verbiage about Arabian Fest—nor does she remember any authorship credit

attributed to Roth. *Id.* at 81:10–14. Angela gave Abu-Shawish a copy of the report at the end of 2001 or in early 2002. According to Abu-Shawish, the document that he received contained 23 pages, including a black second page. (Docket #339 at 60:9–10).

In February of 2002, Abu-Shawish sought, and received, an extension of time to "finalize work on [the] redevelopment plan." (Docket #292 at 70:1–5). In May 2002, Abu-Shawish submitted a Muskego Avenue Redevelopment Plan to the City of Milwaukee. Abu-Shawish's Muskego Avenue Plan is a twenty-two-page version of the original, thirty-five-page Roth Report. Other salient differences include different typeface and size, and the substitution of "Arabian Fest" for "Milwaukee Alliance" in certain locations. The title page states that the plan was "prepared by Arabian Fest" and "presented by Mhammad Abu-Shawish." An acknowledgments page thanks Milwaukee Alliance for "help and partnering with Arabian Fest." Nobody else is given writing or preparation credit. When the FBI searched Abu-Shawish's home, they found two other drafts of the Roth Report—both of which were versions of the one that Angela had shortened. In other words, there is no evidence that Abu-Shawish ever received the full, unedited Roth Report, bearing references to Milwaukee Alliance, and bearing Roth's authorship credit.

### 3.2    Credibility

The Court pauses here to summarize certain factual issues surrounding Abu-Shawish's credibility. In 2005, a jury found him guilty of mortgage fraud—a conviction that, while old, has some bearing on Abu-Shawish's credibility, particularly since it occurred fairly close in time to the events in this case. *See Abu-Shawish v. United States*, 175 Fed. App'x 41 (7th Cir. 2006). The government also provides evidence that Abu-Shawish has

continued to engage in conduct that might raise some doubts as to his credibility. For example, the government provides an excerpt of a 2017 small claims case, in which a judge declined to uphold a contract that Abu-Shawish had entered into because it was "so full of oddities," including some original pages, some photocopies, and different colored inclusions, that it was deemed untrustworthy. (Docket #341-1 at 3:7–10; 4:13). The judge said, "I guess my only recommendation would be, sir, is that you should probably conduct your business in ways that are a lot more orderly and transparent and not adding things after the fact with different colors and so forth. Some of them are his and some of them are—so if you can separate them out." *Id.* at 5:2–8.

Finally, the Court turns to its own previous observations of Abu-Shawish. During the sentencing hearing in the above-captioned case, the parties contemplated whether to apply an enhancement for obstruction of justice pursuant to U.S. Sentencing Guidelines 3C1.1. The Court invited the government "to put on the record precisely what in Mr. Abu-Shawish's testimony you believe to have been false[.]" (Docket #287 at 25:15–18). The government gave a statement, which contained two clear examples of false testimony:

> Randy Roth, who was the author of the actual plan, this claimed relationship that Mhammad Abu-Shawish tried to portray in court as if he was a supervisor of Mr. Roth, and the project was totally contested by Mr. Roth's testimony. There was no financial arrangement between the two. Mr. Abu-Shawish testified himself.
>
> I think the jury could see just his command of the English language never matched Mr. Roth's command of the English language, had Mr. Roth's written word that the words that were written in his report were clearly, solely Mr. Roth's

plans, except for a few changes where "Milwaukee alliance" was changed to "Arabian fest."

In addition, he claimed to have individuals working for him. Lisa Sanfilippo specifically came into court and said she was not working for him; that she never worked for Arabian Fest; and that money was not[]. . .paid to her.

(Docket #287 at 26:5–25). In response, the defense attorney argued that there was evidence in the record demonstrating that the Roth Report was a group effort, and that Roth and Abu-Shawish had met several times regarding the project. *Id.* at 28:6–15. Moreover, the defense attorney noted that Lisa was, in fact, paid for her work from the Arabian Fest account, and Lisa's sister, Angela, appeared to have forged Lisa's signature and deposited the checks into her own account. *Id.* at 28:16–29:3.

In light of those arguments, and with the benefit of having observed Mr. Abu-Shawish testify at trial, the Court made the following findings:

While it is true that this testimony. . .may not fall in the category of having the tentacles of a tale woven out of whole cloth, . . .[w]hat Mr. Abu-Shawish endeavored to do was to acknowledge so much of the government's case as he would be required to acknowledge without losing all face in front of the jury. But I suggest, at the end of the day, as found by the jury, they didn't buy his story. And there is no reason for this Court to buy that story either.

It is true that Mr. Roth, for example, did have some contact with Mr. Abu-Shawish with regard to the plan development. But I dare say, there is nothing in the trial record that even gives a hint of Mr. Roth being cognizant of what in reality was at work here; namely, pounding his good work that had previously been submitted, and for which Mr. Roth received, I believe, as I recall, somewhere in the area of $25,000 for his work. And then to have Mr. Abu-Shawish take the same work and add a $50,000 mark up to it, just defies all reality.

*Id.* at 30:13–31:11. The Court further characterized Abu-Shawish as a "prevaricator, someone who will twist the facts to meet his view of what the law ought to be." *Id.* at 31:23–25. The Court noted that "the Court of Appeals may, looking at the cold transcript, come to a different view," but from its "vantage point. . .it [was] not even a close question." *Id.* at 32:9–21.

### 4.    ANALYSIS

The Court will address the government's objections to the magistrate's R&R, which are that (1) it failed to properly apply the appropriate burden of persuasion required of litigants seeking certificates of innocence; and (2) the record did not support a finding that Abu-Shawish was, in fact, credible. As a preliminary matter, the Court agrees with Abu-Shawish's contention that Magistrate Judge Joseph applied the correct burden of persuasion. Magistrate Judge Joseph clearly stated that the central inquiry is whether Abu-Shawish can prove his innocence by a preponderance of the evidence and she used that burden to evaluate the evidence. (Docket #344 at 2, 28). Indeed, the government does not actually point to an instance where Magistrate Judge Joseph varied from the appropriate burden. Therefore, the Court will disregard this objection because it is unfounded and non-meritorious. However, the Court will review, *de novo*, Magistrate Judge Joseph's conclusion that Abu-Shawish was credible, and draw its own conclusions as to the suitability of the certificate of innocence pursuant to Section 2513(a).

Magistrate Judge Joseph correctly notes that the parties' briefing is primarily concerned with whether Abu-Shawish had intent to defraud, which is the *mens rea* required under 18 U.S.C. §§ 1341, 1343. The government also suggests that Abu-Shawish is guilty of misappropriation of trade secrets in violation of Wis. Stat. §§ 943.205(1)(a)&(3), 134.90. As

Magistrate Judge Joseph observed, these statutes also require "intent to deprive or withhold" a trade secret, or "intent to appropriate. . .without authority of the owner." *See* (Docket #344 at 19). The issue therefore turns on Abu-Shawish's intent—in this case, whether the preponderance of the evidence shows that he *did not* have an intent to defraud, deprive, or misappropriate the report.

As Magistrate Judge Joseph noted, the Seventh Circuit pattern jury instructions provide that "intent to defraud" means that "the acts charged were done knowingly with the intent to deceive or cheat the victim in order to cause a gain of money or property to the defendant or the potential loss of money or property to another." *United States v. Lillie*, 669 F. Supp. 2d 903, 906–07 (N.D. Ill. 2009) (internal quotations omitted); Seventh Circuit Pattern Criminal Jury Instructions, 432 (2012 ed.). The parties do not dispute that this is the same standard that would apply to other crimes that could be charged based on the same conduct. Therefore, the Court will use this definition of "intent to defraud" in its evaluation of whether Abu-Shawish has proved, by a preponderance of the evidence, that he did not act with intent to defraud when he submitted the Roth Report as his own.

The government stands by its original indictments, which charge that Abu-Shawish represented to the City of Milwaukee that he would draft a business plan regarding development on Muskego Avenue, and then intentionally deceived them by plagiarizing a report that the City of Milwaukee had already paid Roth to write. The government contends that the red flags in Abu-Shawish's background completely undermine his credibility. Thus, they argue, even if there were not enough evidence to convict him of a crime, his fraudulent history forecloses any chance that he could, by a preponderance of the evidence, be found *innocent* in this case.

The government argues that the issue hinges on Abu-Shawish's credibility, and they are correct that Abu-Shawish's credibility warrants serious inquiry. This is because Abu-Shawish insists that he did not realize he was not supposed to submit the Roth Report—i.e., the report given to him by Angela—as part of his project. He claims that he did not know that Roth authored it, nor that Roth was independently hired by Milwaukee Alliance to draft a report for Milwaukee Alliance—not Arabian Fest. This goes to the heart of Abu-Shawish's intent, regardless of whether the charged conduct is wire fraud or misappropriation of a trade secret. The question, to reiterate: is there enough evidence to demonstrate that Abu-Shawish *did not act with intend to defraud, deprive, or misappropriate*? In other words, has Abu-Shawish proven, by a preponderance of the evidence, that he *did not* act with a criminal *mens rea* when he submitted Roth's report as his own?

Weighing against Abu-Shawish's credibility are the following facts: (1) he was previously found guilty of mortgage fraud for activity that occurred around the time of these events; (2) the jury in the 2005 trial found him not credible; and (3) in the 2005 trial, this Court found him not credible.[2] If there was no other evidence in the record—just Abu-Shawish's affidavit and these facts—then the petition would surely lose. However, the record is more complicated than the preceding paragraph otherwise suggests. This Court has repeatedly—and reasonably—expressed serious incredulity

---

[2]The 2017 transcript that the government included from small claims court is utterly devoid of context—it is unclear what the contract in question is in reference to—and the Court notes that the oddities identified were not all Abu-Shawish's responsibility. Thus, while the Court understands the government's implication, such a context-less submission is not especially probative of whether Abu-Shawish committed a crime when he submitted a truncated version of the Roth Report on behalf of Arabian Fest.

about Abu-Shawish's version of the events. But even if Abu-Shawish's testimony is appropriately considered through a lens of extreme skepticism, the surrounding evidence corroborates it.

The following facts bolster Abu-Shawish's eroded credibility: (1) the 2008 trial elucidated the role that Donovan played in muddling the functions of Milwaukee Alliance and Arabian Fest; (2) the 2008 trial included evidence that Roth was anxious about the source of his funding, and that Donovan was interested in securing multiple streams of funding for the Muskego Avenue project—suggesting that Donovan contributed to the confusion about the division of labor between the organizations; (3) Donovan told Angela to shorten the report, edit it to be less focused on Milwaukee Alliance, and give it to Abu-Shawish to work off of; (4) the FBI's raid on Abu-Shawish's home produced two other drafts of the allegedly plagiarized report, neither of which was the full report—thereby supporting Abu-Shawish's contention that he only received a truncated version of the report from Angela, never saw the original, and did not know that Roth was the original writer or that the intended recipient was Milwaukee Alliance; and (5) Abu-Shawish has been unwavering in his version of the facts.[3] *See e.g.*, (Docket #287 at 8:4–20) (sentencing transcript in which Abu-Shawish argued to the Court that he believed Angela had drafted the final report, and he submitted a report based on what she gave him.)

---

[3]It is true that guilty people may maintain their innocence out of self-preservation or self-delusion—just as innocent people may plead guilty to avoid a guilty verdict at trial. Nonetheless, the consistency of Abu-Shawish's position means that there is no additional obstacle for the Court to address with regard to his credibility.

But this is not simply an issue of weighing Abu-Shawish's credibility. Although it has been bolstered somewhat, the Court has been clear that it does not deem Abu-Shawish to be an altogether believable figure, particularly when speaking about issues that may benefit him. Therefore, the Court turns to the remaining evidence with the following question: why would Abu-Shawish unquestioningly take a report given to him by a part-time staffer, swap out the name of the staffer's other part-time organization for his own organization, and submit those ideas as his own—if he did *not* intend to plagiarize the report? Does the preponderance of the evidence really support the conclusion that Abu-Shawish innocently and reasonably believed he was intended to present the report that Angela gave him as his own? In short—it does.

While Abu-Shawish did receive a grant to develop a plan to recruit business for the City of Milwaukee, neither his proposal nor the grant itself stipulated that he needed to write the plan. Nor has the government provided any evidence that the grant's funding was conditioned upon Abu-Shawish drafting such a plan. Moreover, Abu-Shawish was candid about the fact that his English was imperfect and that he relied heavily on his team, whose members spoke and wrote the language better than he did. He did not hold himself out as a writer or an academic. As Magistrate Judge Joseph observed, "the purpose of the $75,000.00 grant was to develop a business plan to recruit new Arab owned businesses along Muskego Avenue. . .Even if the work Abu-Shawish completed on the written report was arguably not worth $75,000.00, the evidence does not support that the project itself was not worth $75,000.00," particularly in light of the recruitment initiatives, neighborhood improvement efforts, and data compilation that the project funded. (Docket #344 at 25–26). Although the

Court previously expressed strong reservations as to the value that Abu-Shawish rendered to the City of Milwaukee with his submission of the Roth Report as his own, a second examination of a more thorough factual record reveals that Abu-Shawish did, apparently, attempt to hold up his end of the bargain with the City of Milwaukee.[4] These facts support the conclusion that the City of Milwaukee was not defrauded by Abu-Shawish's failure to draft his own written plan.

The evidence demonstrates that Abu-Shawish presented himself as a mover and a shaker, someone who could recruit business and drum up support for an Arab-American district on Muskego Avenue. Perhaps *this* was puffery, but not outrageously so; at the time, he directed the largest Arab-American festival in the United States. (Docket #339 at 24:19–21) (characterizing it as the "only and largest Arab American festival in the United States"). The record demonstrates that Abu-Shawish set out to do exactly the sorts of "planning" activities that he represented he would do—he participated in efforts to decrease crime, spearheaded surveys of the neighborhood that were ultimately used in the Roth Report, travelled to Chicago regularly to recruit business owners, and met with various business leaders in his own community to explore the viability of building an Arabian hub on Muskego Avenue. As Roth suspected, Abu-Shawish's

---

[4]On the issue of correcting prior misconceptions, the Court also previously stated, in its order denying the initial certificate of innocence, that "an audit later revealed that [Abu-Shawish] had taken the money for his own personal use." (Docket #311 at 3). This is not entirely accurate—the audit "showed that Abu-Shawish accounted for the checks to cash and the transfer to the personal bank account as wages for himself." *United States v. Abu-Shawish*, 507 F.3d 550, 552–53 (7th Cir. 2007). Abu-Shawish was permitted to pay himself a salary from the grant, and the parties do not raise the issue of his management of the grant's finances before this Court.

efforts were unavailing, but this is not a crime—sometimes project plans are not successful.

At some point towards the end of 2001, a final, written report was expected from Arabian Fest, though it is unclear who would write it or what it would contain. As it happened, due to Donovan's efforts, Roth was finishing up his comprehensive, thirty-four-page report regarding the development potential of Donovan's district, which included Muskego Avenue and featured an "international themed development" as a "concession" to Abu-Shawish's dream of an Arabian hub. Case No. 07-CR-289 (Docket #45 at 87:6–15). It was this report—featuring this "concession" of an international district—that Abu-Shawish ultimately submitted on behalf of Arabian Fest.

But the following evidence strongly suggests that that Abu-Shawish did not act with intent to defraud when he used Roth's report. First, upon Milwaukee Alliance's receipt of the report from Roth, Donovan instructed Angela to take out references to the Milwaukee Alliance and make it more generally applicable to other organizations, and then give it to Abu-Shawish so that he could "work off of it." Angela complied and shortened the report. Lisa proof-read this report—which was only twenty-two pages, non-Milwaukee Alliance Specific, included data from Arabian Fest's efforts, and lacked Roth's author credit. Then Angela sent the 22-page report to Abu-Shawish towards the end of the grant period. There is evidence that Donovan knew that Abu-Shawish would submit the Roth Report on behalf of Arabian Fest. Case No. 07-CR-289 (Docket #45 at 238:1–9). There is no evidence that Abu-Shawish ever received the full Roth Report, which would have included Roth's author credit. Per Angela and Donovan's instruction, Abu-Shawish exclusively "work[ed] off of" the

Case 2:03-cr-00211-JPS   Filed 07/27/20   Page 22 of 26   Document 349

report that Angela gave him—he made a few cosmetic edits, and presented the report to the city. He gave author credit to "Arabian Fest."

But what was "Arabian Fest"? To Abu-Shawish and the CBGC, it was an organization with three employees, several volunteers, and the support of Donovan, which worked to turn Muskego Avenue into an Arabian corridor. But to those other employees—Lisa and Angela—as well as to people who worked with the organization, like Roth, the distinction between Arabian Fest and Milwaukee Alliance was less clear. In fact, the record illustrates that there was significant confusion from the employees at Milwaukee Alliance—who were also employees at Arabian Fest—as to what the difference between the two organizations was, as well as what each's organization's hierarchies, funding streams, and ultimate goals were. The evidence demonstrates that Lisa and Angela were not clear about who their bosses were—indeed, Lisa thought that Milwaukee Alliance and Arabian Fest were a "joint event," and Angela took directions from Donovan. Case No. 07-CR-289 (Docket #45 at 55:4–8); (Docket #292 at 24:1–11) (noting that "Mhammad gave us overall direction," but was not involved in day-to-day activities, including data gathering; "on a day-to-day basis it was Bob Donovan" who provided instruction).

Roth was similarly unsure about who was funding him or what the relationship was between Abu-Shawish and Milwaukee Alliance. He also did not seem to realize that Angela worked for both Milwaukee Alliance and Arabian Fest. Roth was hired to draft a report on the viability of a revitalization project on Muskego Avenue, Roth used some of the data collected under the Arabian Fest grant, Roth understood Abu-Shawish to be somewhat important in the Muskego Avenue development project, and Roth nodded to Abu-Shawish's dream of an Arabian hub by including a

portion about an "international district" (which he privately thought would only work if it incorporated the pre-existing communities in the area, which were not Arab). Abu-Shawish (erroneously or not) believed that Roth was there to help him with Arabian Fest. Roth did not consent to Abu-Shawish using his work, but it seems that Roth also did not know how Donovan would use his report—particularly because Donovan promptly instructed Angela to alter the report so that it would not be specific to Milwaukee Alliance. And as for the report's intended purpose, the evidence supports the conclusion that the individuals in this case—Abu-Shawish, Roth, Lisa, and Angela—were unclear about where Milwaukee Alliance ended and where Arabian Fest began.

Contrary to the Court's original instinct, even if Abu-Shawish's testimony is approached with skepticism, the evidence suggests that it is more probable than not that Abu-Shawish's actions did not constitute a crime. The indictment charged that Abu-Shawish acted with intent to defraud—and this Court has assessed whether the evidence demonstrates that Abu-Shawish acted with intent to deprive or misappropriate property, as required by related state law crimes if he committed the acts alleged. But the evidence, after fourteen years, two jury trials, and an evidentiary hearing on the issue of Abu-Shawish's credibility, demonstrates a likelihood that Abu-Shawish did *not* act with intent to defraud, deprive, or misappropriate property. First, the evidence supports a conclusion that Arabian Fest's grant from the City of Milwaukee was not solely to draft a written plan, nor was it contingent on Abu-Shawish being the person to author any ultimately submitted plan. Second, the evidence supports the conclusion that Abu-Shawish did not subjectively realize that he was not

supposed to use the report that Angela gave him and present it as a product of Arabian Fest.

To this second point, the Court observes that even if Abu-Shawish *did* know that Roth initially drafted the report, the evidence still does not demonstrate that Abu-Shawish's use of it on behalf of Arabian Fest would constitute a crime. *See Pulungan*, 722 F.3d at 985 (holding that a person could be actually innocent if "what they did is not a crime."). The evidence demonstrates that Donovan created a loose set of community organizations with multiple funding streams and did not bother to delineate boundaries, divide work, or otherwise put his affiliates on notice that they were not all working together. In fact, according to the transcripts, Donovan *told* Angela to change the Roth Report, and then told Angela to tell Abu-Shawish to work off of it. Angela herself testified that the report was a "collective plan" featuring information from Roth, Abu-Shawish, and "other groups." (Docket #292 at 18:19–19:11). In professional environments, the moral premium on originality frequently gives way to collaboration and vetted prose. It is not uncommon for organizations to circulate templates and documents drafted by one person and presented by another. In short, there are some situations in which professionals know and consent to their colleagues' re-use of their work in furtherance of a greater goal. The moral failing, here, seems not to lie in Abu-Shawish's use of Roth's work, but in the fact that nobody told Roth that he was drafting a document that would not be attributed to him.

A different conclusion would result if the evidence demonstrated a reasonable likelihood that Abu-Shawish received the Roth Report in full—with Roth's author credit—and knew that Roth had prepared the report for Milwaukee Alliance, *not* Arabian Fest. Similarly, a different conclusion

Case 2:03-cr-00211-JPS   Filed 07/27/20   Page 25 of 26   Document 349

would result if it had been Abu-Shawish, and not Angela, who shortened the report and removed most references to Milwaukee Alliance. But the evidence points to the conclusion that Abu-Shawish never received the full report with Roth's author credit, and had no reason to know that the report was prepared for use by Milwaukee Alliance—*not* Arabian Fest. From this evidence, it is reasonable to infer that Abu-Shawish did not knowingly plagiarize Roth's report, and did not act with intent to misappropriate the report or otherwise deprive its rightful owner of it. In short, and against all odds, Abu-Shawish has demonstrated by a preponderance of the evidence that he is innocent of any crime involving fraud, deprivation, or misappropriation of property.

**5.      CONCLUSION**

For the reasons explained above, the Court has concluded that the government's objections to the R&R should be overruled. Magistrate Judge Joseph's R&R will be adopted, and Abu-Shawish will receive a certificate of innocence.

Accordingly,

**IT IS ORDERED** that Magistrate Judge Nancy Joseph's Report and Recommendation (Docket #344) be and the same is hereby **ADOPTED**; and

**IT IS FURTHER ORDERED** that Abu-Shawish's petition for a certificate of innocence (Docket #306) be and the same is hereby **GRANTED**.

Dated at Milwaukee, Wisconsin, this 27th day of July, 2020.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge